

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00226-CR

_____

ANTONIO PARRA PEREZ, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. 58,433-C

_____

Before Sudderth, C.J.; Meier and Kerr, JJ.
Opinion by Chief Justice Sudderth

# OPINION

A jury found Appellant Antonio Parra Perez guilty of two counts of aggravated sexual assault and three counts of indecency by contact against two of his grandchildren, Ana and Brianna.[1] *See* Tex. Penal Code Ann. §§ 21.11, 22.021 (West Supp. 2017). The trial court sentenced him to two life sentences for the aggravated sexual assault convictions and three consecutive twenty-year sentences for the indecency convictions. On appeal, Perez complains of the trial court's admission of extraneous-offense testimony by two of his younger sisters to incidents of sexual abuse allegedly committed by him in the 1960s and its admission of testimony by a social worker and sex-offender-treatment provider to the characteristics and dynamics of situations of sexual abuse. We affirm.

## Background

### I. Ana and Brianna's outcries

Cousins Ana and Brianna spent a lot of time at the home of their grandparents, Perez and his wife, Regina. Perez and Regina often babysat their grandchildren, and the whole family would often gather together at their home for family dinners together.

---

[1]We refer to the complainants and family members by aliases in an attempt to protect their privacy. *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

After one such family dinner on Saturday, May 31, 2014, Brianna's mother Jennifer was helping Brianna, who was seven at the time, undress for a bath when she noticed that the side of Brianna's left breast was "puffed." Jennifer testified that upon noticing the mark, Brianna exclaimed, "[O]h, grandpa," and when Jennifer asked her what she meant, Brianna told her that "grandpa like[d] to bite her boobs" and that it made her "a little sore." Jennifer testified that Brianna also said that Perez liked to kiss her and put his tongue in her mouth and she did not like that, and that Perez had recently started taking out his private part and rubbing it "on the front and back of her . . . private areas." Jennifer testified that Brianna also mentioned something about her cousin Ana that concerned her.

The next day, Jennifer went to her parents' home and confronted Perez in front of other family members, including one of her sisters and Regina. According to Jennifer, Perez dismissed the allegations and claimed that he just patted Brianna on the leg and occasionally gave her a kiss on the cheek or a peck on the mouth. The family then called Ana's father, Leo, and told him to bring his wife, Mary, and Ana to the home.

Once they arrived, Jennifer told Leo and Mary about Brianna's allegations. Leo and Mary took Ana to another room and asked Ana if Perez had touched her inappropriately. Mary testified at trial that Ana "kind of looked at [them] and got teary eyed and said, yes. And she said that he had been touching her and she pointed to her private area." According to Mary, Ana "scooted to the edge of the bed and she

3

opened her legs and said that he had been rubbing her down there and pointed to her private area."

Later, once they were at home, Ana revealed more details of the abuse, telling Mary that Perez "had been touching down there and rubbing her down there in her private area and that he had been making her touch him in his private area" in an up and down motion, that she had seen Perez's penis and seen "something clear and slimy" come out of it, and that "he would also put his private area to her private area and then she said that he would also put it to her . . . butt area." According to Mary, Ana said that "she was scared to say anything but now she felt like everything was fine to talk about." Ana said all of the events happened in the computer room or his bedroom.

On the same day that she confronted Perez about the allegations and shared them with Mary and Leo, Jennifer reported the allegations to police. Within days, the two girls were taken for forensic interviews with Shannon May of Patsy's House Children's Advocacy Center. May testified at trial to both girls' descriptions of the abuse. According to May, Ana told her that Perez would make her kiss him in exchange for candy, that Perez "put his pee pee[2] through her underwear," that Perez's "pee pee had touched her butt," and that Perez had put his mouth on her vagina.

_____

[2]May clarified during the interview that Ana referred to Perez's penis as a "pee pee" and her own genitalia as a "pee pee."

4

May also recounted Brianna's descriptions of Perez making her touch his penis at least twice and his direction not to tell anyone.

May also described drawings that each girl made during her interview, and those drawings were admitted into evidence. Ana made two drawings. One drawing included a stick figure and a tongue with an arrow connecting the tongue to the stick figure's genital area, the words "PeePee," "Balls", and the sentence "[Ana] is sad." Ana's second drawing included a depiction of two stick figures lying in a bed, a "PeePee" with hair on it, a "little hole" and the word "slim[y]." Brianna wrote on a piece of paper, "My Grapa put hes metal paret in my metal paret [sic]."

Perez was charged with seven counts of aggravated sexual assault and indecency with a child by contact as follows:

- Count 1: Aggravated sexual assault of Ana by penetrating her sexual organ with his;

- Count 2: Aggravated sexual assault of Ana by penetrating her sexual organ with his tongue;

- Count 3: Indecency by sexual contact by touching Ana's genitals;

- Count 4: Indecency by sexual contact by causing Ana to touch his genitals;

- Count 5: Aggravated sexual assault of Brianna by penetrating her sexual organ with his;

- Count 6: Indecency by sexual contact causing Brianna to touch his genitals; and

- Count 7: Aggravated sexual assault of Ana by penetrating her anus with his sexual organ.

5

## II.  Testimony at trial

### A.  Ana and Brianna

Ana was eight when she testified at trial to Perez's sexual abuse.  She testified, "[W]e would watch cartoons and then he would like start touching me [with] . . . [h]is hands."  She described how he touched her legs and her "middle part,"[3] how he put his "middle part" in hers twice, how he made her touch his "middle part," how he touched her butt with his "middle part," and how he touched her "middle part" with his tongue.

Brianna was ten at the time of trial.  She testified that the abuse took place in Perez's bedroom and in the computer room in his house.  Brianna alleged that Perez bit her breast and forced her to put her hand on his penis and move her hand up and down.  She also recounted in detail how Perez "put his middle part in [hers]" "a lot of times," and she described it as feeling "weird and sticky" and "[s]limy."  Brianna also recalled an instance when Perez put his penis in her anus.  According to Brianna, Perez directed her not to tell anybody about the abuse.

### B.  Sexual assault nurse examiners

Each girl was examined by a sexual assault nurse examiner (SANE) and both SANEs testified at trial.

---

[3]Ana and Brianna both referred to Perez's penis and their own genitals as their "middle parts" throughout their testimony.

Michelle Smith examined Ana. At trial, Smith recounted Ana's description of the abuse:

> Grandpa tells me to go and watch cartoons in his room. He opens my legs, he makes me sit on the edge of the bed. He . . . takes out his thing and puts it in mine. He does it every day when I come over. He tries to kiss me, but I don't want to, but he does.

Smith testified that a physical examination of Ana revealed a "possible notch" in her hymen. She explained that she could not make a definitive finding regarding the cause of the notch but that it was consistent with the sexual acts that Ana had described. She estimated that fewer than ten percent, and possibly as low as four percent, of examinations observing physical trauma lead to a definitive finding, and those examinations are conducted immediately after the abusive event.

Heather Lampe examined Brianna. Lampe recounted for the jury Brianna's description of the abuse: "My grandpa put his middle in my middle. He did it at his house. He did it a lot of times. He unbuttoned his pants and pulled down his underwear, he unbuttoned my pants and pulled down my underwear. Told me don't tell anybody. It felt weird." Lampe also testified that Brianna indicated that the abuse was painful. Lampe testified that during the physical examination she observed a notch in Brianna's hymen and described the notch as a nonspecific finding that could have been caused by the abuse Brianna described but also could have been caused by a nontraumatic event.

## C. Perez's sisters

The State called two of Perez's younger sisters, Stacy and Tina, to testify to their allegations of his sexual abuse of them when the sisters were young children. Perez's counsel objected to their testimony as improper extraneous-offense evidence, and a hearing was held outside the presence of the jury.

Stacy and Tina each described the small home in which their family, of which Perez was the oldest of seven children, lived in Monterrey, Mexico, in the 1960s. Both women described how Perez, the oldest of the seven children, shared an upstairs room with a brother and that the women would regularly clean as part of their chores.

Stacy is fifteen to twenty years younger than Perez and described an incident that took place when she was no older than seven or eight years old, in the mid- to late-1960s. Stacy testified,

> What I remember is that I would lay down and be looking at the floor, but he would be over me. I would remember his breathing and . . . he was breathing really hard and I remember the pressure of my panties were on my ankles and his - - I guess he had pulled them down and - - and he had his thing in between my legs.

She clarified that his "thing" was his penis and that the area between her legs was her vagina, but could not remember if his penis penetrated her vagina. Stacy testified that she pretended she was not there and that she did not understand what was happening. She did not recall it happening again, but she did recall another instance after the family moved to Wichita Falls in 1970 when Perez picked her up "so [she] was like

straddled to him" and she said, "[N]o, no you ain't going to do this here. You're not going to do this here." She said that he put her down when she said that.

Although the incident between Stacy and Perez was never reported to authorities, Stacy testified that she spoke to one of her sisters about the incident and her sister's response was, "[N]ot you too."

In fact, Tina testified at trial, "[Perez] would have intercourse with myself and my other sisters." She described how she and her sisters would go upstairs to clean the room that Perez shared with a brother and Perez would force them to lie down on the bed, and he would have sex with them. She also alleged that Perez would sometimes make her touch his penis and would come to her bed and fondle her while she pretended to sleep. She testified, "It was something that was constantly happening all the time," and that, at the time, she did not understand what was going on. She described it as "[d]isgusting." She testified that she did not tell anyone about his sexual abuse because he was the oldest sibling and they were taught to respect him.

The trial court overruled Perez's objections to Stacy's and Tina's testimony as improper extraneous-offense evidence, finding that there was sufficient evidence for the jury to believe that the incidents of abuse took place and that its probative value was not outweighed by a danger of unfair prejudice. Stacy and Tina each repeated their testimony for the jury.

9

**D. Jennifer Edwards**

The State sought to call Jennifer Edwards, a licensed sex-offender treatment provider, as an expert witness, and Perez objected. A hearing was held outside the jury's presence.

Edwards testified to her education and background, including her 21 years of experience working for an agency that treated only sex offenders, as a forensic interviewer at a children's advocacy center, and as a forensic interviewer for Rockwall County. She described her review of and reliance on research such as peer-reviewed journals regarding sex-offender treatment. She testified that she treated "thousands" of sex offenders over the years. Edwards testified that, at the time of trial, she had a private therapy practice in McKinney where she treated a variety of people, some with "average issues" such as depression, anxiety, and marital issues, but the majority being sex offenders. Edwards testified that through her education and experience, she had learned common characteristics of perpetrators and victims, including the type of power and control that exists in such a relationship and the difficulties children have testifying in court.

On cross-examination, Edwards admitted that she had not evaluated Perez and did not intend to talk about Perez specifically in her testimony. Edwards also admitted that there is no recognized profile of a sex offender, but that she would instead be discussing "some common characteristics in behavior and thought." Edwards further testified that she would be providing "general jury education about

10

basically what to look for because what we learn through the media is very inaccurate." She detailed the categories of behavior she expected to talk about, such as "minimizing an offense, making excuses or justifying an offense, using . . . power play over the victim, thoughts of self pity[,] . . . grooming."

Perez's counsel objected to Edwards's testimony on the basis that it was not relevant because she could not tie her testimony to Perez specifically, relying upon the case of *Williams v. State*, 895 S.W.2d 366 (Tex. Crim. App. 1994). The trial court overruled Perez's objection and explained that it felt the case of *Duckett v. State*, 797 S.W.2d 906 (Tex. Crim. App. 1990), was more closely aligned with the facts of this case.

In front of the jury, Edwards made it clear that her testimony was not intended to determine Perez's guilt, but to provide "general education about sex offender and . . . child sexual abuse dynamics." She explained that sex offenders come from all kinds of backgrounds, socioeconomic classes, ages, and professions, and can be married or not. She testified that 97–98% of child sexual abuse victims know their perpetrators because sex offenders are able to plan their access to the victim, manipulate the victim, and maintain a close relationship with the victim to keep the abuse secret. She testified that incest is common among sexual abusers and that it is "very common" for sex offenders to take risks with children, even when other children or adults are around. Edwards testified that abusing the child when other family members are nearby "sends a message from the perpetrator that I am all

11

powerful, I can do what I want whenever I want and wherever I want." Edwards testified that she has encountered alibis by perpetrators that things were "misconstrued, that the child didn't understand what was happening or . . . just said it was one thing because they didn't know the word for the thing that was happening." Edwards also testified that a sex offender can be emboldened when they are not caught early on and that she had cases where the abuse was multigenerational.

Edwards also testified to general characteristics of child abuse victims. She said that it was "incredibly common" for children to refrain from telling someone about the abuse until it had been going on for some time and that a child might disclose a little bit about the abuse to a parent, gauge the parent's reaction, and then decide if they want to disclose more. She explained that this can be due to a sense of confusion the child may have about the abuse, especially if the abuser is someone they have a close relationship with. Edwards also affirmed that she has encountered children who try to block abusive events from their mind and that some adults do not disclose child sexual abuse until decades after the events. She also testified that it was "very common" for children to, a couple of years after the abuse took place, remember some details vividly and other details not as well.

When given the hypothetical of children who see their abuser several times a week or at family gatherings and to whom other family members are deferential, Edwards testified,

12

> Somebody who is held in high regard within the family, it's less likely that the child is going to make an outcry. Children are - - you know, again, their level of awareness about many things is far beyond what we realize and often children will be concerned that they will disrupt the family dynamics, that everybody will be upset, everybody will be angry, whether they're believed or not believed, they just know this is . . . a bomb, they understand that and what a big deal this is. And so certainly if that person is held in high regard, the concern the child has about not being believed is exponentially greater . . . .

Edwards also explained how sex abuse can escalate, beginning with grooming and then progressing to sexual acts.

Edwards also testified that she had never personally encountered an instance where more than one child lied about sexual abuse allegedly committed by the same perpetrator.[4]

On cross-examination, Edwards confirmed that it would be "wrong" for the jury to interpret her testimony as evidence of Perez's guilt. And she confirmed that there is no real profile of a typical sex offender and that she never met with or evaluated Perez.

## III. The jury's charge and verdict

In the jury charge, the trial court included the following limiting instruction regarding extraneous-offense testimony:

> During the trial, you heard evidence that the defendant may have committed wrongful acts not charged in the indictment. The State

---

[4]At trial, Perez's counsel objected to this testimony on the basis that it was "going far afield of general characteristics," but the trial court overruled his objection. Perez does not pursue this objection on appeal.

offered the evidence for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant, absence of mistake or accident, motive, and intent. You are not to consider the evidence at all unless you find, beyond a reasonable doubt, that the defendant did, in fact, commit the wrongful act. Those of you who believe the defendant did the wrongful act beyond a reasonable doubt may consider it.

Even if you do find that the defendant committed a wrongful act, you may consider this evidence only for the limited purpose previously described. You may not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense. In other words, you should consider this evidence only for the specific, limited, purposes described above.

The jury found Perez guilty of counts 1, 3, 4, 5, and 6; it found him not guilty of counts 2 and 7. After a punishment hearing, the jury assessed life sentences for counts 1 and 5 (aggravated sexual assault) and 20-year sentences for counts 3, 4, and 6 (indecency with a child). This appeal followed.

## Discussion

Perez brings three points on appeal. His first two points relate to the trial court's admission of Stacy's and Tina's testimony to Perez's alleged abuse of them as children in the 1960s. His third point argues that the trial court erred by admitting Edwards's testimony.

## I. Extraneous-offense testimony by Stacy and Tina

Article 38.37 statutorily expands the admissibility of extraneous-offense evidence in a trial involving certain offenses against children, including the sex offenses at issue here. Tex. Code Crim. Proc. Ann. art. 38.37, § 1(a)(1)(A), (B) (West

2018). Section 1(b) of the article applies to evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense. *Id.* § 1(b). Section 2, on the other hand, is not limited to evidence of offenses committed against the child who is the victim in the immediate prosecution:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, and subject to Section 2-a, evidence that the defendant has committed a separate offense described by Subsection (a)(1) or (2)[5] may be admitted . . . for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.
>
> Sec. 2-a. Before evidence described by Section 2 may be introduced, the trial judge must:
>
> (1) determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt; and
>
> (2) conduct a hearing out of the presence of the jury for that purpose.

*Id.* §§ 2–2-a.

Section 2 is at issue in this case. The trial court held two hearings outside the presence of the jury, one to evaluate Stacy's testimony and a second to evaluate Tina's, and found that each woman's testimony was adequate to allow the jury to find beyond a reasonable doubt that Perez sexually abused them as children. The trial court also conducted a rule 403 balancing test and determined that the probative value of their testimony was not outweighed by any unfairly prejudicial nature thereof.

---

[5]Subsections (a)(1) and (2) include sexual offenses, assaultive offenses, and prohibited sexual conduct committed against a child under 17 years of age. *Id.*

15

Perez's first point argues that article 38.37 is facially unconstitutional; his second point argues that the trial court erred by admitting Stacy's and Tina's testimony under article 38.37. We overrule both points for the reasons discussed below.

## A. Constitutionality of article 38.37, section 2

We review the constitutionality of a statute in light of the presumption of the statute's validity and presume that the legislature did not act unreasonably or arbitrarily in enacting the statute. *Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex. Crim. App. 1978). It is Perez's burden to show that the statute is facially unconstitutional in all of its applications. *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 908 (Tex. Crim. App. 2011) (orig. proceeding).

Perez argues that article 38.37 is facially unconstitutional because it "is overly broad, circumvents the rules of evidence prohibiting extraneous offense evidence, and violates the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, particularly a defendant's right to due process and an impartial jury." We have previously rejected these exact arguments in regards to what is now section 1(b) in *Martin v. State*, 176 S.W.3d 887, 901–02 (Tex. App.—Fort Worth 2005, no pet.) (addressing prior version of the statute), and expounded upon our reasoning in *Gregg v. State*, No. 02-16-00117-CR, 2016 WL 7010931, at *3–6 (Tex. App.—Fort Worth Dec. 1, 2016, pet. ref'd) (mem. op., not designated for publication). Although we mentioned in *Gregg* that some of our sister courts have upheld the constitutionality

of section 2, we did not directly address section 2's constitutionality in *Gregg* because it was not at issue. *Id.* In dicta in a separate case, we expressed our intent to hold that section 2 is constitutional. *McNamara v. State*, No. 02-16-00422-CR, 2018 WL 2248665, at *7 (Tex. App.—Fort Worth May 17, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that appellant's constitutional challenge to section 2 of article 38.37 was not preserved but noting that if it was, we would join our sister courts in holding it constitutional). With the constitutionality of section 2 properly at issue here with the testimony of Stacy and Tina, we formally join our sister courts in holding that it is constitutional.

Due process demands that the State prove every element of the crime charged beyond a reasonable doubt. U.S. Const. amend. XIV, § 1; *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S. Ct. 2781, 2788 (1979). Determining whether a statute violates a defendant's substantive due process rights first requires a determination of whether a fundamental right or liberty interest is involved; as we held in *Martin* and explained further in *Gregg*, the right to a trial free of extraneous-offense evidence is not equivalent to the recognized fundamental right to a fair trial. *Gregg*, 2016 WL 7010931, at *4 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 2268 (1997)). We are not alone in that decision, either. *See United States v. Mound*, 149 F.3d 799, 801 (8th Cir. 1998) (holding federal rule 413, which allows evidence of other sexual assaults, does not implicate a fundamental right because "it was within Congress's power to create exceptions to the longstanding practice of excluding prior-

bad-acts evidence"); *United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir.) ("Considering the safeguards of [federal] Rule 403, we conclude that [federal] Rule 413 is not unconstitutional on its face as a violation of the Due Process Clause."), *cert. denied*, 525 U.S. 887 (1998); *Harris v. State*, 475 S.W.3d 395, 401 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) ("Appellant has failed to cite any controlling authority providing that he has a fundamental right to a trial free from the introduction of extraneous offense evidence."); *cf. Ex parte Chamberlain*, 306 S.W.3d 328, 334 (Tex. App.—Fort Worth 2009) ("In the absence of authority establishing that a sex offender possesses a fundamental right or liberty interest in his reputation, we decline to recognize this allegedly fundamental right or liberty interest."), *judgment vacated on other grounds*, 335 S.W.3d 198 (Tex. Crim. App. 2011).

In Perez's view, section 2 is too broad because it allows extraneous-offense evidence for "*any bearing the evidence has on relevant matters*," including propensity or character evidence as it relates to the defendant. Tex. Code Crim. Proc. Ann. art. 38.37, § 2 (emphasis added). And as Perez points out, this does go against the general approach to extraneous-offense evidence which has limited its admissibility as character or propensity evidence. *See Boyd v. United States*, 142 U.S. 450, 458, 12 S. Ct. 292, 295 (1892) ("However depraved in character, and however full of crime their past lives may have been, the defendants were entitled to be tried upon competent evidence, and only for the offense charged.").

But as a society and a legal system, we have recognized that the unique nature of sexual assault crimes justifies the admission of extraneous-offense evidence, even though traditional notions of due process generally caution against the admission of such evidence. *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972); *Johns v. State*, 236 S.W.2d 820, 823 (Tex. Crim. App. 1951); *Jenkins v. State*, 993 S.W.2d 133, 136 (Tex. App.—Tyler 1999, pet. ref'd) ("The special circumstances surrounding the sexual assault of a child victim outweigh normal concerns associated with evidence of extraneous acts."). Prosecutors of child sex offenses encounter evidentiary problems because they must typically rely upon largely uncorroborated testimony of the child victim—or victims in this case at hand—thrusting the child's credibility into the spotlight. *Belcher v. State*, 474 S.W.3d 840, 845 (Tex. App.—Tyler 2015, no pet.).

Our sister courts have uniformly held that section 2 is constitutional and have analogized it to Federal Rule of Evidence 414, which allows evidence that a defendant committed "any other child molestation" to be considered "on any matter to which it is relevant" in the prosecution of child molestation. Fed. R. Evid. 414(a); *see Holcomb v. State*, No. 09-16-00198-CR, 2018 WL 651228, at *2 (Tex. App.—Beaumont Jan. 31, 2018, pet. ref'd) (mem. op. on reh'g, not designated for publication); *Buxton v. State*, 526 S.W.3d 666, 685–89 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *Mayes v. State*, No. 05-16-00490-CR, 2017 WL 2255588, at *18–19 (Tex. App.—Dallas May 23, 2017, pet. ref'd) (mem. op., not designated for publication), *petition for cert. filed* (U.S. May 2, 2018) (No. 17-8755); *Burke v. State*, No. 04-16-00220-CR, 2017 WL 1902064,

19

at *2 (Tex. App.—San Antonio May 10, 2017, pet. ref'd) (mem. op., not designated for publication); *Carrillo v. State*, No. 08-14-00174-CR, 2016 WL 4447611, at *8–9 (Tex. App.—El Paso Aug. 24, 2016, no pet.) (mem. op., not designated for publication); *Gates v. State*, No. 10-15-00078-CR, 2016 WL 936719, at *4 (Tex. App.—Waco Mar. 10, 2016, pet. ref'd) (mem. op., not designated for publication); *Bezerra v. State*, 485 S.W.3d 133, 139–40 (Tex. App.—Amarillo, pet. ref'd), *cert. denied*, 137 S. Ct. 495 (2016); *Robisheaux v. State*, 483 S.W.3d 205, 209–13 (Tex. App.—Austin 2016, pet. ref'd); *Belcher*, 474 S.W.3d at 843–47; *Harris*, 475 S.W.3d at 398–403.

This is primarily because the defendant still has the protection of certain procedural safeguards. The State must notify the defendant before trial of its intent to use such evidence, and the trial court must hold a hearing outside the presence of the jury to determine that the evidence "will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." Tex. Code Crim. Proc. Ann. art. 38.37, § 2-a; *see also Belcher*, 474 S.W.3d at 847 (comparing article 38.37's protections to those guaranteed in federal practice). As we discuss below, defendants are entitled to the protection of rule 403 against any evidence that is so prejudicial that it is likely to deprive the defendant of a fair trial. *See Bezerra*, 485 S.W.3d at 140 ("[A]ppellant does not identify how an objection under Texas Rule of Evidence 403, such as was asserted by appellant, fails to remedy [the] danger [of admitting propensity evidence.]"). While Perez takes issue with the statute's failure to expressly guarantee an on-the-record rule 403 analysis, the statute does not preclude

20

the defendant's request for a rule 403 balancing test to be performed. Tex. Code Crim. Proc. Ann. art. 38.37, § 2(b) (beginning "[n]otwithstanding Rules 404 and 405, Texas Rules of Evidence," but not excluding application of Rule 403). Courts have uniformly held that a rule 403 analysis does not have to be conducted on the record, and Perez has given us no reason to require otherwise. *See Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997) (explaining that appellate courts presume the trial court engaged in the required balancing test once rule 403 is invoked).

Perez points to decisions issued by courts in other states declaring similar statutes unconstitutional, *see State v. Ellison*, 239 S.W.3d 603, 606–08 (Mo. 2007), *superseded by constitutional amendment as discussed in State v. Williams*, 548 S.W.3d 275, 280 (Mo. 2018); *State v. Cox*, 781 N.W.2d 757, 772 (Iowa 2010), but we are not persuaded by their reasoning, *see Robisheaux*, 483 S.W.3d at 211–13 (acknowledging *Ellison* and *Cox* but adopting the reasoning of *Belcher* and *Harris*, opinions of our sister courts, in upholding article 38.37).

Having held, as our sister courts have, that section 2 of article 38.37 is constitutional, we overrule Perez's first point.

### B. Admissibility of Stacy's and Tina's testimony

In his second point, Perez argues that the trial court erred by admitting Stacy's and Tina's testimony to the alleged abuse they endured from Perez in the 1960s. His argument is two-fold: first, that the trial court erroneously found their testimony admissible under article 38.37 and second, that the trial court erroneously found that

the probative value of their testimony was not outweighed by the danger of unfair prejudice.

We will review both complaints for an abuse of the broad discretion afforded to the trial court's decisions to admit or exclude evidence. *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990) (op. on reh'g); *Ryder v. State*, 514 S.W.3d 391, 399 (Tex. App.—Amarillo 2017, pet. ref'd). If the court's decision falls outside the "zone of reasonable disagreement," it has abused its discretion. *Montgomery*, 810 S.W.2d at 391. We will first address the admissibility of Stacy's and Tina's testimony under article 38.37 and then address its admissibility under rule 403.

### 1. Article 38.37 analysis

Perez argues that there was "no evidence" to support the trial court's finding that Stacy's and Tina's testimony provided evidence sufficient to enable the jury to find beyond a reasonable doubt that Perez committed the alleged offense of sexual assault of a child. Perez argues that the evidence was "too remote in time," unsupported by any physical evidence, and uncorroborated by any report to the appropriate authorities.

A charge of aggravated sexual assault requires proof that the accused intentionally and knowingly caused the sexual organ of a child under 14 to contact the sexual organ of another person, or intentionally and knowingly caused the penetration of a child's sexual organ by any means. Tex. Penal Code Ann. § 22.021(a)(1)(B)(iii),

22

(2)(B). Indecency with a child by contact requires proof that the accused touched the genitals of a child under 17. *Id.* at § 21.11.

By statute, a complainant's testimony may be sufficient evidence to convict a defendant. Tex. Code Crim. Proc. Ann. art. 38.07 (West Supp. 2017). And it is well established that the uncorroborated testimony of a child victim alone can be sufficient to support a conviction of aggravated sexual assault of a child. *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978).

Stacy and Tina both testified to Perez's abuse of them when they were children. Physical evidence and a timely report to the authorities are not required to support a conviction for sexual assault or indecency with a child. *See id.* Here, their testimony alone was sufficient to place the trial court's ruling in the zone of reasonable disagreement. *See id.* We therefore overrule Perez's second point in regard to the admissibility of Stacy's and Tina's testimony under article 37.38.

## 2. Rule 403 analysis

Perez argues that the trial court erred by overruling his rule 403 objections to Stacy's and Tina's testimony. We agree.

When a rule 403 objection is made, the trial court must engage in a balancing process. *Nolen v. State*, 872 S.W.2d 807, 811 (Tex. App.—Fort Worth 1994, pet. ref'd). Factors that the trial court should consider in the balancing include: (1) how compellingly the extraneous-offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence

presented by the proponent to show the defendant in fact committed the extraneous offense; (2) the potential that the extraneous offense will impress the jury in some irrational but indelible way; (3) the amount of trial time that the proponent uses to develop evidence of the extraneous offense; and (4) the proponent's need for the extraneous-offense evidence. *Id.* at 811–12.

Perez relies primarily on our decision in *Mosier v. State*, No. 02-16-00159-CR, 2017 WL 2375768 (Tex. App.—Fort Worth June 1, 2017, pet. ref'd) (mem. op., not designated for publication). Mosier was convicted of continuous sexual abuse of his teenage niece and nephew. *Id.* at *1. Mosier's sister testified at trial to her memory of an incident that took place when she was four or six years old, about 25 years before the trial, and Mosier forced her to perform oral sex on him. *Id.* at *3. Mosier objected to the testimony under rule 403, arguing that the events his sister testified to were too remote, that the evidence would risk confusion of the issues because of its similarity to the charged offenses, and that any probative value was substantially outweighed by the risk of unfair prejudice. *Id.* at *8. The trial court allowed the testimony. In our review, we observed that the remoteness of the events was "troublesome," and that there were "significant differences" between the conduct described in his sister's testimony and the allegations of abuse of his niece and nephew. *Id.* at *9. We ruled that the trial court erred but that the error was harmless. *Id.* at *12–14.

In this case, the remoteness factor of Stacy's and Tina's testimonies is more concerning than the testimony by Mosier's sister. Stacy and Tina testified to incidents that allegedly took place in the 1960s—50 years or more before the trial. As we observed in *Mosier*, remoteness is a factor we must consider, as a substantial gap in time between the occurrence of extraneous offenses—especially those in which a final conviction was not obtained—and the charged offense will weaken the probative value of the extraneous-offense evidence. *Id.* at *9 (citing *Bachhofer v. State*, 633 S.W.2d 869, 872 (Tex. Crim. App. [Panel Op.] 1982) (holding that, without a final conviction or evidence of intervening similar offenses, evidence of extraneous offense four years before charged offense was inadmissible in prosecution for indecency with a child)).

Weighing further against admission of Stacy's and Tina's testimony is the complete lack of any evidence of intervening misconduct by Perez during the 50 years between the abuse they suffered and Perez's abuse of Ana and Brianna. *Id.* at *10. Any such intervening misconduct could have "narrow[ed] the gap" between the extraneous and charged offenses. *See Curtis v. State*, 89 S.W.3d 163, 174 (Tex. App.— Fort Worth 2002, pet. ref'd). Stacy's testimony to an instance in Wichita Falls in 1970 when Perez picked her up so that she was straddling him does not provide this link. *See Mosier*, 2017 WL 2375768, at *10 (explaining that alleged intervening misconduct was not actually misconduct where Mosier's sister merely "thought" that Mosier wanted to have sex with her that day).

There are some similarities between the abuse alleged by Stacy and Tina and the abuse that Ana and Brianna testified to. Stacy testified that she was under eight years old, and Tina was under the age of thirteen; Brianna was seven and Ana was five. Both the women and the girls testified that Perez forced them to engage in intercourse and inappropriate touching. But, in our view, these similarities do not outweigh the remoteness of the sisters' testimony and the lack of intervening misconduct, both of which weigh against admission of the sisters' testimony.

Stacy's and Tina's testimony comprises 91 pages of the 600 pages, roughly fifteen percent, of testimony presented to the jury by both sides in the guilt and innocence stage. This factor weighs slightly in favor of excluding the sisters' testimony.

Finally, we reject the State's argument that Stacy's and Tina's testimony to abuse that allegedly occurred fifty years ago was necessary to counter Perez's arguments that Ana and Brianna had been influenced by other adults. In making this determination, we look to the other probative evidence available to the State to establish a fact related to an issue in dispute. *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999). Ana and Brianna testified in detail to the abuse committed by Perez. May testified to their detailed descriptions of the abuse during each girl's forensic interview, and to the girls' drawings depicting the abuse. The girls' mothers testified to their outcries of the abuse, and Jennifer testified to her observation of Brianna's "puffed" breast after they returned from Perez's home. The SANEs

26

testified to both girls' descriptions of the abuse. And both SANEs testified to their observations of notches in each girl's hymen that, although not conclusively indicative of abuse, were consistent with their descriptions of the abuse. We disagree with the State's assertion that it needed Stacy's and Tina's testimony because it lacked any "physical evidence or eye-witness testimony" to corroborate Ana's and Brianna's testimony, especially in light of the 50 years that passed in between the alleged events and the complete lack of corroborating evidence to support Stacy's and Tina's testimony. *See Mosier*, 2017 WL 2375768, at *11. This factor therefore weighs in favor of excluding Stacy's and Tina's testimony.

Having weighed the applicable factors, we conclude that the trial court abused its discretion when it found that the danger of unfair prejudice and confusion of the issues did not substantially outweigh the probative value of Stacy's and Tina's testimony to the extraneous offenses committed in the 1960s. *See* Tex. R. Evid. 403.

Having found error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. Tex. R. App. P. 44.2. Error in the admission of evidence in violation of rule 403 is generally not constitutional. *See, e.g., Reese v. State*, 33 S.W.3d 238, 243 (Tex. Crim. App. 2000). We therefore apply rule 44.2(b) and disregard the error if it did not affect appellant's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.

*King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

As we discussed above, the jury had the benefit of Ana's and Brianna's explicit testimony to the abuse they suffered from Perez. They also had the benefit of testimony by the girls' mothers, the forensic interviewer, and the SANEs to the girls' descriptions of the abuse. The girls' drawings made during the forensic interview were also admitted into evidence—drawings that said "[Ana] is sad" and "my [grandpa] put [his middle] par[t] in my [middle] par[t]," depicted Perez's "[b]alls," his "[p]ee[p]ee," and his tongue, and depicted him lying in bed with Ana.

Even so, the State inexplicably felt compelled to emphasize the alleged abuse of Stacy and Tina repeatedly during its closing arguments. The prosecutor first

mentioned that Stacy, Tina, Ana, and Brianna were all prepubescent female family members when the abuse took place. He then mentioned the sisters' demeanors when they testified:

> You also heard from [Tina], the Defendant's oldest sister that testified, and you can look at her demeanor. You saw how she was more calm and reserved, very matter of fact about what had happened. And then you compare that to [Stacy], the Defendant's other sister who also testified. If you recall, [Stacy] testified about abuse that happened nearly 50 years ago. And what did she say she remembered to this day? She can still feel his hot breath on her neck. And you saw [Stacy], a woman in her mid-50s break down as she tried to detail what she went through at the hands of this Defendant, her own brother.

And then in his final closing argument and in response to Perez's counsel's assertion that the sisters never reported the abuse, the prosecutor pointed out that Stacy did outcry when she was young by telling her mother and her sister what happened. The prosecutor then said,

> I was also struck by something defense counsel said, not just in its closing arguments a few minutes ago, but also in his opening arguments to begin the case. He said all this was, once you take away the medical evidence was a he said, she said case. Ladies and gentlemen, this is a he said, she said, she said, she said, she said case. Four victims testified to the abuse that this Defendant did to them. **Two of those victims are the ones who you're going to have to decide whether or not they were telling the truth when they testified.** [Emphasis added.]

We find this last sentence especially troubling. It essentially directs the jury that they do not have to evaluate Stacy's and Tina's credibility—a direct contradiction of the trial court's instruction that the jury *must* find beyond a reasonable doubt that the extraneous offenses actually occurred before it can consider the evidence for any

29

reason. *See Ware v. State*, 62 S.W.3d 344, 352 (Tex. App.—Fort Worth 2001, pet. ref'd) (discussing a similar article 38.37 jury instruction). The jury absolutely had to weigh Stacy's and Tina's credibility before it considered their testimony as evidence of propensity or character, or for any other reason.

The prosecutor also emphasized in his final closing argument that the jury could consider Stacy's testimony for any bearing it had on relevant matters, including character conformity. He then emphasized the similarities between Stacy, Tina, Ana, and Brianna in that they were all "prepubescent female family members over whom the Defendant had some degree of power and control." He continued,

> You heard her testify that it was a family secret, that he would have her lay down, he would be behind her and that 50 years later she can still remember his breath on her neck. That's a sensory detail right there. And what did she say? She said it was a family secret, that when it happened she would pretend she wasn't there.
>
> You then heard from another one of the Defendant's sisters, [Tina]. She said that she was deferent to the Defendant and basically treated him like you would a parent whenever her parents were away. You would hear how he sneaks into her bed at night while she pretends to be asleep and he puts his fingers in her vagina. You then heard how he would get on top of her, face-to-face in that upstairs shack room and penetrate her vagina with his penis. When asked how it felt, she said it was disgusting. What did the Defendant say? You better not tell anyone. Manipulation.
>
> And what did both [Stacy] and [Tina] testify to? That when their brother went into the Army, they said they were relieved. Not concerned that their brother might be sent to an area to face combat, they were relieved because he wouldn't be around anymore.
>
> Plato said, "The true measure of a man is what he does with power." And we've seen what the Defendant does with power. The

power he had over his two younger sisters, the power he had over his two granddaughters here in Wichita Falls. Instead of fond memories of their older brother, instead of fond memories of grandpa, they're going to remember sodomy, oral sex, incest, vaginal intercourse with a blood relative.

Later, the prosecutor asked the jury, "What would be the motive for [Brianna] and [Ana] and [Stacy] and [Tina] to testify untruthfully?" He asserted that the defense had not established any motive for the four of them to lie, and argued, "[I]t wasn't as if the Defendant didn't have a chance to tell you. He got up on the witness stand. He never said why this wouldn't be true." And finally, the prosecutor ended his argument as follows:

> Ladies and gentlemen, I would submit to you, sexual predators are . . . wolves in . . . sheep's clothing. And there's a wolf in this room right now and he's sitting right here. This is a wolf who began to prey on his own family in Monterrey, Mexico, and then preyed on his granddaughters here in Wichita Falls. But today it ends. Today it ends when you say we believe you [Brianna]. Today it ends when you say we believe you [Ana] that these things happened. And when you come back with those seven verdicts of guilty, you're not going to be telling this wolf anything he doesn't already know.

We find the State's emphasis in closing on Stacy's and Tina's testimony troubling, especially in light of the substantial other evidence the State had at its disposal. Unlike the situation in *Mosier*, Ana and Brianna, though understandably nervous, were not reluctant to testify or uncooperative during their testimony. *See Mosier*, 2017 WL 2375768, at *1 (describing one complaint as "a reluctant witness," whose testimony was "choppy, brusque, and quite often altogether unresponsive").

31

Despite our disapproval of the State's approach and its emphasis on Stacy's and Tina's testimony, we must consider it in light of the substantial evidence offered by Ana, Brianna, their mothers, May, and the SANEs. Ana and Brianna gave detailed testimony to the jury of their own recollections of the abuse and their mothers, May, and the SANEs all described the girls' outcries and descriptions of the abuse. Finally, we must consider the limiting instruction the trial court gave to the jury in its jury charge. Generally, we presume that the jury followed this instruction. *Adams v. State*, 179 S.W.3d 161, 165 (Tex. App.—Amarillo 2005, no pet.).

And so, having reviewed the entire record, we conclude that the trial court's error in admitting Stacy's and Tina's testimony to the extraneous offenses did not have a substantial or injurious effect on the jury's verdict and did not affect Perez's substantial rights. *See King*, 953 S.W.2d at 271. Thus, we disregard the error. *See* Tex. R. App. P. 44.2(b). We therefore overrule the remainder of Perez's second point.

## II. Edwards's testimony

In his third point, Perez argues that the trial court abused its discretion by admitting Edwards's testimony over his objection that the testimony was irrelevant because it had not been sufficiently linked to the facts of the case.

Expert testimony is inadmissible if it is irrelevant. *See* Tex. R. Evid. 402, 702. Expert testimony should be limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror. *Yount v. State*, 872 S.W.2d 706, 710–11 (Tex. Crim. App. 1993). There is a "fine but essential" line

between helpful expert testimony and impermissible comments on credibility. *Shutz v. State*, 957 S.W.2d 52, 60 (Tex. Crim. App. 1997).

Edwards's testimony can be divided into two categories: (1) her testimony to recognized characteristics of sexually abused children and (2) her testimony to recognized characteristics of sex offenders. Even though the majority of Edwards's testimony was to the former category, Perez's argument does not complain of her testimony in this respect. Because Perez has not challenged the testimony regarding the characteristics of sexually abused children, he has forfeited any argument about it on appeal. *See* Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (citing cases), *cert. denied*, 566 U.S. 1036 (2012).

Instead, Perez's argument is focused upon Edwards's testimony regarding sex-offender characteristics. Specifically, Perez argues that Edwards's testimony was inadmissible because she had not personally evaluated Perez, she had not performed any actuarial tests of Perez, she acknowledged that there is no profile of a "typical" sex offender, and she admitted that she had "nothing specific" to tell the jury about the case. According to Perez, "[t]he record is completely devoid of any attempt to make a connection between her general 'jury education' testimony and the specifics of this case." We disagree.

Perez relies primarily upon *Williams* to support his argument. In *Williams*, a prosecution for telephone harassment, the expert testified to the psychological profile of an offender who makes harassing telephone calls of a sexual nature. 895 S.W.2d at

366. The court of criminal appeals held that such testimony had to be "applied . . . or connected to the facts of the individual case" in order to be considered helpful to the jury. *Id.* Because the expert did not specifically apply his psychological profile testimony to actual characteristics possessed by the defendant, the court held that it was not helpful to the jury and therefore inadmissible. *Id.*

On the other hand, the State relied upon the court of criminal appeals' decision in *Duckett* to argue that Edwards's testimony as a whole was reliable. The trial court agreed that *Duckett* applied, and we agree with the trial court. In *Duckett*, a prosecution for indecency with a child, a certified social worker and advanced clinical practitioner testified as an expert witness to the phases experienced by child victims of sexual abuse, and then he applied those phases to the particulars of the case. 797 S.W.2d at 908. He particularly opined about why a child's recollections of events could change in the time between the offense and the trial and to whether it was unusual not to discover some physical manifestation of trauma. *Id.* at 909. The court of criminal appeals held that the testimony was admissible: "[I]f a qualified expert offers to give testimony on whether the reaction of one child is similar to the reaction of most victims of familial child abuse, and if believed this would assist the jury in deciding whether an assault occurred, it may be admitted . . . ." *Id.* at 917. In support of its holding, the court of criminal appeals observed:

> The expert's testimony here encompassed at least one specialized view concerning the process through which a child may encounter and deal with an abusive situation. The record does not reflect the jury was of

such composition that the knowledge was elementary or commonplace. What has been termed the dynamics of intrafamily child sexual abuse may now appear before the public in the form of newspaper articles, books and television programs, but such attempts to educate the public only underscores the foreignness of the subject to society in general and a lay jury in particular.

*Id.*

In this case, Edwards testified to the following general characteristics of sex offenders: that they come from all kinds of backgrounds, socioeconomic classes, ages, and professions, and can be married or not. She also testified that it is very common for child sexual abuse victims to know their perpetrators, for sex offenders to take risks with children even with other children or adults around, and for the abusive relationship to be incestuous. She also testified that, in her experience, perpetrators of sexual abuse have tried to explain away allegations by alleging that things were "misconstrued" or that a child did not understand what was happening. And she testified that a sex offender can be emboldened if they are able to successfully abuse a child without being caught. These characteristics have direct connections to this case—Perez knew Ana and Brianna, his grandchildren, and any sexual abuse was incestuous by its nature, the abuse the children described occurred with other family members nearby, and Perez attempted to counter their allegations by explaining them as misconstructions or that the children simply did not understand what was happening.

So contrary to Perez's assertion otherwise, Edwards's testimony was sufficiently linked to the facts of this case. The trial court acted within its discretion by allowing her testimony and we overrule Perez's third point.

## Conclusion

Having overruled Perez's first and third points and having found that any error in the trial court's admission of his sisters' testimony was harmless, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Publish

Delivered: September 27, 2018

36