

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00265-CR

———————————————

LUCIOUS NEWHOUSE III, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 432nd District Court
Tarrant County, Texas
Trial Court No. 1561061

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

A jury convicted Appellant Lucious Newhouse III of murder and assessed his punishment at life in prison. On appeal, Newhouse challenges only his sentence, arguing in one issue that the trial court erred by admitting evidence related to the shooting death of a woman other than the complainant in the punishment phase of his trial. Because the trial court did not abuse its discretion by admitting this evidence, we affirm.

## II. BACKGROUND

Newhouse does not challenge the sufficiency of the evidence supporting his murder conviction, nor does he raise any error affecting his conviction. However, because the nature of the offense for which he was convicted relates to his appellate issue concerning the extraneous-offense evidence, a brief factual background is necessary.

### A. 2004 Homicide (The Extraneous Offense)

On the morning of March 17, 2004, Fort Worth police found the body of a black female wrapped in two different comforters lying in the weeds and grass at Gateway Park. The body had several gunshot wounds, including a head wound. The police learned that the deceased, Janet,[1] had been in a relationship with Newhouse for

---

[1]To protect their identities, we will refer to both women using aliases. *See, e.g., Upchurch v. State*, 656 S.W.3d 170, 174 n.1 (Tex. App.—Fort Worth 2022, no pet.).

some time and shared two children with him. They spoke to Newhouse, who admitted that he had had sex with Janet the night before the murder and that "she had left around 3:30[ or] 4:00 . . . in the morning." Police found that admission to be significant because her body was found less than three hours later. Newhouse also told the police that he had never seen the blankets[2] that were wrapped around Janet's body, but the police learned that they had belonged to Newhouse and that they were once in his house. When the police searched Newhouse's house, they found "a large smear of blood" on the wooden floor and extensive blood spatter and stains throughout the interior of the house. Months later, they learned that Newhouse had been ticketed the day after Janet's death for illegally dumping a mattress in a privately owned dumpster.

The police never arrested Newhouse, but they did arrest his brother. The grand jury that heard the brother's case declined to indict him, and the case went cold.

## B. 2018 Homicide (The Charged Offense)

On September 2, 2018, the Hopkins County Sheriff's Office and the Sulphur Springs Police Department responded to a 911 call about a possible car crash on the outskirts of Sulphur Springs, Texas. Newhouse was at the scene along with the 911 caller.[3] Sergeant Mike Russell, the first officer at the scene, observed that Newhouse's

---

[2]The terms "comforters" and "blankets" are used interchangeably in the record.

[3]Newhouse and the man who called 911 did not appear to know each other. The 911 caller had observed Newhouse lying in the road and stopped to check on

vehicle was nose-down in a creek; "it looked as if someone had driven it off into the creek." Newhouse claimed that he had been there all night and that he needed a tow truck. Another officer—a deputy—arrived at the scene and approached Newhouse's vehicle while Sergeant Russell was talking to Newhouse. The deputy saw blood on the trunk and on the back bumper, and there were two removable blinking emergency lights on the roof of the car. More personnel arrived at the scene, including a state trooper, who followed the vehicle's tire tracks and found the body of a black female with clothing, soaked in what appeared to be blood, wrapped around her head.[4] There were also miscellaneous articles of clothing around her body. Sergeant Russell contacted more law enforcement personnel, including a Texas Ranger, who unwrapped the clothing around the deceased woman's head, revealing that she had been shot in the head. Using her fingerprints, the Southwestern Institute of Forensic Sciences (SWIFS)[5] was later able to identify her as a woman named Renee.

---

him. He decided to call the police when he saw Newhouse's car in a field.

[4]The crime scene was an open pasture with a creek running through it. The state trooper testified that it had appeared to him "that [Newhouse] would have pulled the vehicle up to a point, the body would have been placed and the vehicle continued, as far as looking at the tracks." The deputy explained that "the weeds that were really tall in the creek bottom were hiding [the creek]. So when driving up to it, you wouldn't know that . . . there was a depression there[,] and the vehicle entered it nose first."

[5]SWIFS is also known as the Dallas County Medical Examiner's Office.

4

While investigating and after learning that Newhouse and his vehicle were connected to Fort Worth, the Texas Ranger and the Sulphur Springs police contacted the Fort Worth Police Department, who then obtained a search warrant for Newhouse's house.[6]  There, they found "quite a bit of blood" in one of the bedrooms.  There were also a couple of shell casings in that room, and there was a black purse on the bed.  Inside the purse was a wallet that contained multiple forms of identification belonging to Renee.

The Texas Department of Public Safety's Crime Laboratory processed Newhouse's vehicle and found two shovels, a pickaxe, a pair of gloves, and green rope in the trunk.  Swabs of the reddish-brown stains on the car tested presumptive positive for blood, and a subsequent DNA analysis identified the DNA profile from the swab of the vehicle's exterior near the trunk as originating from Renee.

The autopsy on Renee revealed that she had a total of three gunshot wounds.  Two bullets were recovered from her body, both .32 caliber—the same caliber as the shell casings that had been found in Newhouse's bedroom.  In December 2018, a grand jury indicted Newhouse for Renee's murder.

## C.  The Trial

At trial, a medical examiner for SWIFS opined that Renee's death was caused by gunshot wounds and that the manner of death was homicide.  Detective Thomas

---

[6]This was the same house that the Fort Worth police had searched in 2004 after Janet's body was found.

5

O'Brien with the Fort Worth Police Department testified that Renee and Newhouse had been in a dating relationship "for months."[7]

Newhouse took the stand in his own defense. When asked if he had had a relationship with Renee, he responded, "Kind of." He admitted that he had shot Renee but claimed that he had done so in self-defense. He testified that he had been asleep in bed when he was awakened by Renee "fussing at" him, wanting his money. According to Newhouse, after he told her no, she pulled a gun on him. He testified that he had feared for his life and had reached for his gun that was under the bed with his money. Newhouse claimed that he had "shot to wound" Renee, although he knew that he was shooting her in the head.

He remembered wrapping up her body and clothes, dragging her body to the front door of his house, loading her body in the trunk of his car, and driving to "somewhere far" away. He testified that he had not called the police because he was "frightened" and "scared" that he might go to jail. He admitted to driving into an open field, taking Renee's body out of his trunk, laying her body on the ground, and then trying to drive back to Fort Worth before getting stuck in a ditch.

The jury found Newhouse guilty of the offense of murder as charged in the indictment. At the trial on punishment, the trial court allowed the State to put on

---

[7]The State also called several other witnesses at the trial on the merits. We limit our summation of the trial testimony to that which is pertinent to Newhouse's appellate issue.

evidence of Janet's 2004 murder over Newhouse's objection that such evidence was "highly prejudicial."[8] As punishment witnesses, the State called a detective who had investigated Janet's homicide in 2004; a former crime lab employee who testified that the DNA profile obtained from Janet's vaginal swab was the same as the DNA profile from Newhouse; Renee's mother;[9] and one of Janet's daughters. The jury assessed his punishment at confinement for life.

## III. DISCUSSION

In his sole appellate issue, Newhouse argues that the trial court erred by admitting the evidence related to Janet's death in the punishment phase of his trial because "[t]he probative value of the evidence was substantially outweighed by the danger of unfair prejudice and/or misleading the jury." The State counters that the trial court did not abuse its discretion by admitting the complained-of evidence because "the similarities between the two murders were striking and [because] extraneous offenses proven beyond a reasonable doubt are relevant for the jury in considering the appropriate punishment for [Newhouse], allowing the probative value to outweigh any unfair prejudice."

---

[8]The trial court interpreted the grounds for this objection as Texas Rules of Evidence 403 and 404(b).

[9]Renee's mother did not testify about Janet's death. She testified that she did not even know Newhouse.

## A. Applicable Law and Standard of Review

At the punishment phase of trial, evidence may be offered "as to any matter the [trial] court deems relevant to sentencing." Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1). "Determining what is relevant [at the punishment stage] should be a question of what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999). But a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

In analyzing a Rule 403 objection, the trial court must engage in a balancing process.[10] *Upchurch*, 656 S.W.3d at 178. In conducting a Rule 403 balancing test, a court must consider (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence and balance those factors against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence

---

[10]Here, the trial court conducted a balancing test on the record, and Newhouse does not allege otherwise.

already admitted. *Id.*; *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

We review the trial court's admission of evidence over a Rule 403 objection for an abuse of discretion. *Perez v. State*, 562 S.W.3d 676, 689 (Tex. App.—Fort Worth 2018, pet. ref'd). If the trial court's evidentiary ruling is correct under any applicable theory of law, then it will not be disturbed. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). In reviewing a trial court's determination of the admissibility of extraneous-offense evidence, we recognize the trial court's superior position to gauge the impact of the evidence and, accordingly, will reverse "rarely and only after a clear abuse of discretion." *Lumsden v. State*, 564 S.W.3d 858, 877 (Tex. App.—Fort Worth 2018, pet. ref'd). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)). "A trial court judge is given considerable latitude with regard to evidentiary rulings." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018).

## B. Analysis

As to the first *Gigliobianco* factor—the inherent probative force of the proffered evidence—Newhouse contends that the probative value of the extraneous-offense evidence was "low" because "law enforcement admitted the only physical evidence tying Newhouse to the death of [Janet] was his DNA[,] and law enforcement lacked

9

additional evidence to show [that he] committed the offense." The record does not support this contention. In addition to the presence of Newhouse's DNA on Janet's murdered body, the State also put on evidence that the comforters or blankets that were wrapped around her body belonged to him. The police also found blood inside Newhouse's home and learned that he and his brother had been caught trying to dispose of a mattress the day after Janet's death. As the detective who testified to these facts explained, "when you fit all the puzzle pieces together, it paints a pretty damning picture." Consequently, we conclude that this factor weighs in favor of the admission of the complained-of evidence.

As to the second *Gigliobianco* factor—the proponent's need for the evidence— Newhouse contends that the State did not need this evidence because he had already been convicted of murder in the trial on the merits. This contention misses the point that, "except as otherwise provided by statute or rule, a jury is entitled to have before it 'all possible relevant information about the individual defendant whose fate it must determine.'" *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006) (quoting *Sells v. State*, 121 S.W.3d 748, 766 (Tex. Crim. App. 2003)). And in this case, the State needed the evidence linking Newhouse to Janet's death because it was the only evidence that tended to show his involvement in a crime strikingly similar to Renee's murder. *See Jimenez v. State*, No. 13-19-00162-CR, 2020 WL 7251868, at *5 (Tex. App.—Corpus Christi–Edinburg Dec. 10, 2020, no pet.) (mem. op., not designated

10

for publication) (reasoning that "the State's need for the [extraneous] evidence was great because there was no other evidence that tied [the defendant] to the other [crimes], which was a major part of the State's case on punishment").

Our sister court in Austin has analyzed this issue in a similar case. In *Harris v. State*, the trial court allowed the State to introduce evidence that the defendant in a murder trial had attacked a person other than the decedent with a box cutter. 572 S.W.3d 325, 332 (Tex. App.—Austin 2019, no pet.). On appeal, the defendant contended that the trial court erred by overruling his objection to the evidence about the extraneous bad act during his punishment trial because it was "unduly prejudicial" and violated Rule 403. *Id.* at 337. In affirming the conviction, the court of appeals reasoned that "the charged offense and the extraneous bad act . . . were similar in several ways" and that "the extraneous bad act had probative value because it showed [the defendant]'s pattern of conduct. . . . Further, given the high probative value of this evidence and the broad punishment range, the State's need for this evidence was high." *Id.* Here, similar to *Harris*, Newhouse faced a broad range of punishment: five to ninety-nine years or life in prison. *See* Tex. Penal Code Ann. §§ 12.32(a) (imprisonment range for first-degree felony), 19.02(c) (classifying murder as a first-degree felony). The reasoning from *Harris* applies to this case, and the second *Gigliobianco* factor weighs in favor of the admission of the complained-of evidence.

As to the third through fifth *Gigliobianco* factors—any tendency of the evidence to suggest a decision on an improper basis, any tendency of the evidence to confuse

11

or distract the jury, and any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight—the *Harris* court's analysis also persuades us that these factors weigh in favor of admitting the evidence of Janet's murder at Newhouse's punishment trial. "Given that the extraneous bad act established a pattern of conduct, and that a defendant's character and criminal history are legitimate concerns in sentencing, consideration by a jury of the extraneous bad act would not suggest decision on an improper basis or distract from the main issue." *Id.* And here, like in *Harris*, the trial court gave the jury a limiting instruction,[11] which "minimized any risk that the jury would have considered the extraneous bad act for an improper purpose or given it undue weight." *Id.* at 338; *see Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011) (noting that jury is presumed to have understood and followed trial court's jury-charge instructions absent evidence to the contrary); *see also Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim.

---

[11]The applicable instruction in the trial court's charge to the jury at punishment read:

> You are instructed that if there is any evidence before you in this case of extraneous crimes or bad acts, before you may consider such evidence, if any, you must be convinced beyond a reasonable doubt that the Defendant committed extraneous crimes or bad acts, if he did. If you believe beyond a reasonable doubt that the defendant committed the extraneous crimes or bad acts, you may consider them in assessing the defendant's punishment.

This is substantively identical to the limiting instruction in *Harris*. *See* 572 S.W.3d at 337–38 n.5.

12

App. 1996) (noting that impermissible inference of character conformity can be minimized through limiting instruction). We therefore reject Newhouse's appellate contentions that the dangers of unfair prejudice and misleading the jury were "high" and that "the jury was not equipped to evaluate the probative force of the evidence."

Finally, as to the sixth *Gigliobianco* factor—the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted—the State had proffered the extraneous evidence to the trial court outside the presence of the jury. The trial court could have reasonably determined that the presentation of the evidence about the extraneous bad act would not consume an inordinate amount of time or merely repeat evidence already admitted. *See Harris*, 572 S.W.3d at 334–35. And, in fact, the testimony of the three witnesses who were called to present this extraneous evidence to the jury comprised only half of one volume in the thirteen-volume reporter's record of Newhouse's trial—validating such a determination by the trial court. This factor, like the others, weighs in favor of the admission of the complained-of evidence.

Newhouse also complains that the evidence "was used to incite and inflame in the juror's minds thoughts of a serial killer." But this is "precisely the type of evidence deemed relevant to the determination of sentencing by the Legislature." *Rodriguez v. State*, 345 S.W.3d 504, 509 (Tex. App.—Waco 2011, pet. ref'd) (quoting *Bain v. State*, 115 S.W.3d 47, 50 (Tex. App.—Texarkana 2003, pet. ref'd)); *see Sanders v. State*, 422 S.W.3d 809, 815 (Tex. App.—Fort Worth 2014, pet. ref'd) ("[A]lthough the

effect of the evidence on the jury may have been indelible, it was not irrational, given that the [L]egislature has expressly permitted evidence of unadjudicated extraneous crimes and bad acts to allow juries to tailor appropriate punishments."); *Fowler v. State*, 126 S.W.3d 307, 311 (Tex. App.—Beaumont 2004, no pet.) ("Evidence of defendant's prior assaults certainly had a tendency to cause a jury to increase his punishment. But that was its legitimate purpose.").

Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). Newhouse had the burden to overcome this presumption by demonstrating that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice or other factors. *See Upchurch*, 656 S.W.3d at 178; *Wells v. State*, 558 S.W.3d 661, 669 (Tex. App.—Fort Worth 2017, pet. ref'd). Because he did not meet that burden, we hold that the trial court did not abuse its discretion in admitting the evidence related to Janet's death in the punishment phase of Newhouse's trial over his Rule 403 objection. Balancing all six of the *Gigliobianco* factors, the trial court's determination that the probative value of the complained-of evidence was not substantially outweighed by the risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence," *see* Tex. R. Evid. 403, was within the zone of reasonable disagreement. We overrule Newhouse's sole issue.

14

## IV. CONCLUSION

Having overruled Newhouse's only issue, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 15, 2024