

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-23-00284-CR

---

STEPHEN LESLIE ROOF JR., Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court No. CR22-0690

---

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

A jury convicted Appellant Stephen Leslie Roof Jr. of continuous sexual abuse of a young child and indecency with a child and assessed his punishment at life imprisonment on both counts, with a $10,000 fine assessed on the indecency count. Roof appeals his convictions and sentences, arguing in three separate issues that the trial court erred reversibly by allowing several witnesses to testify about extraneous sexual acts that Roof had done to them and by allowing a police officer to testify about whether the complaining witness in this case had been "coached" by another witness. Because we hold that the trial court did not abuse its discretion to allow this testimony over Roof's objections, we affirm the trial court's judgments.

## I.  BACKGROUND

### A.  BACKGROUND AND ALLEGATIONS

Alice, the complainant,[1] was born in 2013. Her grandmother, Martie, was in a long-term dating relationship with Roof. In 2016, Martie, Alice, and other members of their family[2] moved into Roof's trailer in Weatherford, Texas. The trailer had two bedrooms; Willie slept in one room, and Belle slept in the other bedroom. At first, Martie slept with Belle, and Missy, Alice, Maureen, and Roof slept in the living room.

---

[1]To protect the identities of the minor children involved in this case, *see* Tex. R. App. P. 9.10(a)(3), we refer to them and their relatives by pseudonyms.

[2]As far as the record reveals, Martie had three children: Maureen, Missy, and Willie. Missy had two daughters: Alice and Belle.

About two years after she had moved into Roof's trailer, Missy bought a camper and began sleeping in it. At that time, there were two beds in the living room; Martie slept in one bed, and Alice and Roof slept in the other.[3]

Roof had a job delivering newspapers, and Alice would accompany him on his paper route. After Missy's grandmother admonished her to stop letting Alice go on Roof's paper route with him, Missy told Alice that she could not go on the paper route anymore. However, she never sat Alice down and asked her if anything bad was happening on those paper routes. In 2021, Missy noticed a change in Alice's behavior towards Roof. According to Missy's trial testimony, Alice "loved" Roof; they would hug each other and kiss each other on the cheek, but by 2021, "every time . . . [Roof] would try to go and give her hugs and kisses, she would run the other way" and say, "No, no, no. I don't want no kisses or hugs." He would respond by saying, "Oh, come back, come back. I'm going to take your phone away from you."

In June 2022, Missy decided to move out of Roof's trailer to live with her boyfriend in Springtown. She moved all of her and her children's belongings out of the trailer but let Alice and Belle stay with Roof and Martie for one more weekend. Around that same time, Roof's sister Diane noted that he "was behaving very strangely" by "saying he was suicidal" and "acting very weird about the girls because the mom was wanting to move the girls." On June 7, 2022, Roof twice called the

_____

[3]Missy testified at trial that Alice was five years old when she started sleeping with Roof.

Parker County Sheriff's Office and reported Missy for child abuse. That same day, Diane and her husband, Jean, went with Missy to pick up Alice and Belle from Roof and Martie. Diane, Jean, and Missy took Alice and Belle straight to the Parker County Sheriff's Office to make a report. In the truck on the way to the Sheriff's Office, Alice told Diane, Jean, and Missy that Roof had touched her vagina. Belle denied that Roof had ever touched her inappropriately.

Brittany Lain conducted a forensic interview of Alice at the Children's Advocacy Center of Parker County on June 15, 2022. In that forensic interview, Alice alleged that Roof had committed multiple acts of sexual abuse against her, starting when she was five years old. On June 22, 2022, Diane wrote out a voluntary statement in which she averred that Roof had "raped" her and their sister Theresa when they were younger and had molested Diane's daughter, Carol, when she was six or seven years old. Diane also said that Roof had "admitted" to her that he had molested Carol, that she had kept him away from her children "until 18," and that he had told Martie "when she got with" him that he had molested Carol. Diane further stated that she had talked to Alice "about her mom whipping her and told her it[']s okay for Mom to whip your butt when you[']r[e] in trouble" but that Roof "ha[d]

4

them girls beli[e]ving it[']s child abuse to get their butt[s] whipped."  On September 8, 2022, a grand jury indicted Roof.[4]

## B. THE TRIAL

Prior to trial, the State gave Roof notice of its intent to introduce evidence during its case in chief that Roof had committed extraneous "sexual offenses," including those against Diane, Theresa, and Carol, and the trial court held a hearing at which all three women testified.  *See* Tex. Code Crim. Proc. Ann. art. 38.37 §§ 2-a, 3. At the conclusion of the hearing, Roof objected to admission of the extraneous acts on the basis that "it's more prejudicial than it has probative value."  Over Roof's objection, the trial court allowed the State to introduce the extraneous-offense evidence as requested.

Alice was the State's first witness at trial.  She testified that she thought she was four when Roof started sexually abusing her.  She testified that he "crawled up next to" her when she was sleeping and touched her private parts.  According to Alice, Roof had touched her chest with his tongue and had "moved it around" under her clothes.  She also thought that he had touched her with his hands.  She was not sure how many times that happened.

---

[4]It appears from the record that Roof was arrested on July 15, 2022.  According to the Clerk's Record, Roof was "in the Parker County Jail" that same day, July 15, 2022.

She testified that he put his "front private" inside her "front private . . . [j]ust a smidge." She said he did this more than five times. She described his "front private" as "[h]airy" and "standing up." Alice also testified that Roof would put Vaseline on "the front of [her] private." She said that on more than one occasion, Roof put his finger in her front private and moved it around. She further testified that he put his front private in her back private more than ten times and that it "really hurt." This abuse continued until she moved out.

Additionally, Alice testified that, when she was alone with Roof on his paper route, he would "just find a place" to stop, tell her to fold the backseat down to where it was flat, and then "[p]ut his front private into [her] back private." She said that this happened more than ten times.

Alice emotionally recalled Roof's recording of her saying that Missy hurt her. She testified that she felt bad about that recording because she thought "it was bad" and that she "didn't mean it." Nevertheless, she described her relationship with Roof as "[h]appy" and testified that she loved him and called him "Pawpaw."

The State then called Carol, who was 28 years old at the time of trial. Carol testified that, when she was six or seven years old, Roof had touched her while they were alone together in the little camper trailer where he was staying at the time. She remembered "being put on [her] back and him pulling [her] pants down and . . . touching [her] vagina." She remembered waking up from a nightmare and Roof

6

coming into her room. She testified that he sat next to her and touched her upper thigh, but she did not remember anything else about that incident.

Theresa testified next. She testified that in 1988, when she was about twelve or thirteen, she, Diane, and Roof were living in Jacksonville, Florida, with their mother and stepfather. Their mother had bought her "a book on puberty, and it had pictures in there of women -- all that stuff you don't want boys to see." She testified to one occasion on which her parents were at work and Roof had a friend come over. Roof came in her room and took the book, and she chased after him. She followed him into his room, and his friend then shut the door. Theresa testified that they pulled her down to the ground and removed her clothes. According to Theresa, the friend inserted a bamboo stick into her vagina while Roof was holding her hands behind her head. They were laughing while she was telling them to stop and calling for help. She said that the assault lasted just a minute or two before she got up and ran out of the room naked. She ran next door to her neighbors, who called the police.

About a year later, their mother moved Theresa, Diane, and Roof back to Texas. Theresa testified that Roof drilled peepholes in the wall so that he could look from his bedroom into the bathroom.

Theresa left the house for good when she was fifteen. She did not maintain a relationship with her family, but in 2006, Roof reached out to her. He told her that he had gotten a lucrative job in the oil field and asked her to "buy him work boots and give him a little extra money till he could get paid." Theresa agreed in exchange for

7

Roof coming to her house and doing yard work. At the time, Theresa was living with her husband and children in Springtown. She told him he had to stay in the shed outside her house.

Annie, Theresa's eighteen-month-old daughter, slept with her at the time. One morning, Theresa woke up and "freak[ed] out" because Annie was not in the bed or the room with her. After calling Annie's name and hearing no response, Theresa went through her house and found Roof standing in her kitchen holding Annie in the crook of his arm. He "was sucking on her chest [with] his eyes closed and his head moving in a very sexual way." Theresa testified that she took Annie back to the bathroom and that her chest was wet. She said that she asked Roof "what the hell [he was] doing" and that he responded, "I was motorboating her."

Diane testified that, one night in the summer of 1988, when she was about eleven or twelve and Roof was fifteen or sixteen, he vaginally raped her. She recalled not being able to scream because she had a sock in her mouth. She testified that she began drinking after the rape and that Roof had tried to rape her again when she was drinking, but Theresa's boyfriend came out and saved her. Like Theresa, Diane testified that Roof had "put peepholes in the bathroom walls."

Diane further testified that in 2003, she was living at her mother's trailer in Parker County and that Roof was living in "a trailer behind the trailer." According to Diane, her cousin's daughter had made an outcry, prompting her to ask Carol if Roof had been touching her. Diane testified that Carol "looked very afraid and shook her

8

head no" when in Roof's presence but that when she spoke to her one on one, Carol told her that he had touched her vagina. "She thought it was sex, . . . but she didn't know because she was only seven." Diane reported Carol's allegation to law enforcement but then made a deal with Roof that she would stop cooperating with law enforcement if he told her the complete truth. Diane testified that Roof admitted to grooming Carol, unzipping her pants at night when she was sleeping, molesting her more than once, sitting her in his lap, and touching her in places he should not. But "[h]e never admitted that he was sick," although Diane thought he was sick.[5] She also testified that they agreed "that he would go to Freedom House and receive help for what he was doing," but she did not know if he ever actually went and did that. She confirmed that she did not allow Roof to be around Carol until Carol was eighteen years old.

Among its other witnesses,[6] the State called Investigator Josh Pitman, who had been assigned Roof's case, and asked him if he believed that Missy had "in any way . . . coached [Alice] about what to say." Over Roof's objection, Investigator Pitman testified that he "didn't have concerns about that, no." The State then asked Pitman if he thought that Missy had "the capacity to coach a child in this way." Roof

---

[5]When asked what she meant when she said that Roof was sick, Diane described him as "a predator" and "a monster in a lot of people's lives."

[6]Multiple other witnesses testified at Roof's trial. We limit our summation of the trial testimony to that which is pertinent to Roof's appellate issues.

objected again, and the trial court allowed Pitman to answer, "No, ma'am, I don't believe she did."

The jury found Roof guilty on both counts. At the trial on punishment, the jury assessed a life sentence on each count and a $10,000 fine on the indecency count. The trial court sentenced Roof accordingly.

## II. ANALYSIS

In Roof's first and second issues, he argues error in the admission of evidence against him and that he was harmed by the trial court's error. And in his third issue, Roof complains that even if the trial court's errors in his first two issues are harmless, the cumulative effect of both errors synergistically harmed him "where the State used all the erroneously admitted evidence to buttress [Alice]'s credibility, which was the key issue of the trial."

We review a trial court's ruling to admit evidence over objection under an abuse-of-discretion standard and will not reverse that decision absent a clear abuse of discretion. *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008); *Bautista v. State*, 189 S.W.3d 365, 368 (Tex. App.—Fort Worth 2006, pet. ref'd). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

**A. NO ABUSE OF DISCRETION IN ADMITTING ROOF'S EXTRANEOUS SEXUAL ACTS**

In his first issue, Roof argues that the trial court erred by admitting "a barrage of extraneous sexual acts" through the testimony of Carol, Theresa, and Diane. He contends that his "mostly dissimilar sexual acts committed against several familial children throughout his lifetime" were inadmissible, in his trial for sexual abuse of a non-familial child, under Rule of Evidence 403. That rule permits a trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

In analyzing a Rule 403 objection, the trial court must engage in a balancing process.[7] *Upchurch v. State*, 656 S.W.3d 170, 178 (Tex. App.—Fort Worth 2022, no pet.). In conducting a Rule 403 balancing test, a court must consider (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence and balance those factors against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate

---

[7]Here, the trial court does not appear to have conducted a balancing test on the record, and the parties do not allege otherwise.

amount of time or merely repeat evidence already admitted. *Id.*; *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). In reviewing a trial court's determination of the admissibility of extraneous-offense evidence, we recognize the trial court's superior position to gauge the impact of the evidence and, accordingly, will reverse "rarely and only after a clear abuse of discretion." *Lumsden v. State*, 564 S.W.3d 858, 877 (Tex. App.—Fort Worth 2018, pet. ref'd).

Relying on our opinion in *Perez v. State*, Roof argues that "the probative force of the extraneous acts was diminished due to their temporal remoteness and lack of any previous, proven adjudication." *See* 562 S.W.3d 676, 690 (Tex. App.—Fort Worth 2018, pet. ref'd) ("[R]emoteness is a factor we must consider, as a substantial gap in time between the occurrence of extraneous offenses—especially those in which a final conviction was not obtained—and the charged offense will weaken the probative value of the extraneous-offense evidence."). In *Perez*, we held that a trial court had abused its discretion when it found that the danger of unfair prejudice and confusion of the issues did not substantially outweigh the probative value of testimony by two of the defendant's younger sisters that he had sexually abused them in the 1960s, "50 years or more before the trial." *Id.* at 690–91. The defendant in *Perez* was tried on charges of aggravated sexual assault and indecency by contact for molesting two of his granddaughters, but the trial court allowed two of his sisters to testify to extraneous offenses they claimed he had committed against them. *Id.* at

680–83. We ruled that the trial court had erred but that the error was harmless. *Id.* at 694.

We agree with Roof that the "temporal remoteness" of the extraneous, unadjudicated offenses to which Carol, Theresa, and Diane testified "diminishe[s]" the probative force of this evidence. However, in our *Perez* analysis, we noted "the complete lack of any evidence of intervening misconduct by Perez during the 50 years between the abuse [his sisters] suffered and Perez's abuse of" his granddaughters. *Id.* at 690. We also said that "[a]ny such intervening misconduct could have "narrow[ed] the gap" between the extraneous and charged offenses." Here, Alice—ten years old at the time of trial—testified that she was four when Roof started sexually abusing her. The most remote of Roof's extraneous offenses—his rapes of Theresa and Diane—occurred in 1988, 35 years before trial and roughly 29 years before he began abusing Alice. Carol, who was 28 years old at the time of trial, testified that Roof had touched her vagina when she was six or seven years old. That would mean that Roof touched Carol 20 or 21 years before trial and roughly fifteen years before he began abusing Alice. His "motorboating" of Annie in 2006 would have taken place seventeen years before trial and as little as eleven years before he began abusing Alice. Thus, the "temporal remoteness" between the extraneous misconduct at issue and charged offenses in this case is not nearly as great as it was in *Perez*. *Cf. Transue v. State*, No. 02-22-00155-CR, 2023 WL 5114302, at *6 (Tex. App.—Fort Worth Aug. 10, 2023, no pet.) (mem. op., not designated for publication) (rejecting appellate argument

13

that extraneous sexual offenses, one of which occurred around forty-eight years before trial and the other of which occurred around thirty-two years before trial, "were too remote" and distinguishing *Perez* where less remote extraneous acts "narrow[ed] somewhat the time gap" between more remote extraneous offense and charged offense). And the absence of any adjudication of Roof's prior offenses may weaken their probative force but does not eradicate it entirely.

We must also reject Roof's contention that "the State's need for the extraneous acts was not great because the State was able to admit all of its possible evidence germane to the charged offenses." Roof correctly points out that the State not only had Alice's testimony but was able to get her hearsay statements about his sexual abuse of her into evidence through Missy, Lain, and the pediatric nurse practitioner who had examined Alice. But all this other evidence essentially boiled down to Alice's word, and we agree with the State that "the case hinged on [Alice]'s credibility." Even the nurse practitioner's expert testimony that her "diagnosis was sexual abuse" had to be based on Alice's self-reported patient history, because the only physical injury to Alice that the nurse practitioner had noted was "erythema, or redness, to her labia minora and her prehymenal tissue, [which was] nonspecific for abuse, and there was no genital or anal trauma." The nurse practitioner further testified that she was unsurprised to not make any physical findings that specifically indicated child abuse because her examination of Alice took place two months after the last alleged incidence of abuse. She did not even make any attempts to collect forensic evidence

14

"because it had been two months since anything would have occurred." By contrast, in *Perez*, one child complainant's mother testified to her observation of her daughter's "puffed" breast after a family dinner at Perez's home,[8] and two sexual assault nurse examiners testified to their observations of "notches in each girl's hymen that, although not conclusively indicative of abuse, were consistent with their descriptions of the abuse." *See Perez*, 562 S.W.3d at 680, 682, 691.

Consequently, the trial court in Roof's case could have reasonably found that the State had a substantial need for the extraneous-offense evidence. Combined, the first two *Gigliobianco* factors weigh slightly in favor of admitting the evidence.

As to the third through fifth *Gigliobianco* factors—any tendency of the evidence to suggest a decision on an improper basis, any tendency of the evidence to confuse or distract the jury, and any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight—both Roof and the State agree that this kind of evidence is "inherently inflammatory." *See, e.g., Pawlak v. State*, 420 S.W.3d 807, 809 (Tex. Crim. App. 2013). Both parties also acknowledge that the trial court gave the jury a limiting instruction that specifically addressed its consideration of Roof's extraneous offenses.[9] This instruction

---

[8]This injury was consistent with the same child complainant's outcry that "grandpa like[d] to bite her boobs" and that it made her "a little sore." *Perez*, 562 S.W.3d at 680. At Perez's trial, she testified that he bit her breast. *Id.* at 682.

[9]The applicable instruction in the trial court's charge to the jury read:

15

minimized any risk that the jury would have considered the extraneous evidence for an improper purpose or given the evidence undue weight.[10]  *See Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011) (noting that jury is presumed to have understood and followed trial court's jury-charge instructions absent evidence to the contrary); *see also Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (noting that impermissible inference of character conformity can be minimized through limiting instruction).

Roof also acknowledges that "the extraneous sexual acts did not comprise the sort of scientific or technical evidence that would naturally pose a danger of misleading a jury."  But he contends that we "should not categorize belated, sexual-

---

You are instructed that if there is any testimony before you in this case regarding the defendant's committing offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that such other offenses, if any, were committed and that the defendant committed such other offenses, and even then you may only consider the same in determining the motive, intent, preparation, plan, or knowledge of the defendant, or absence of mistake or accident, or the character of the defendant and acts performed in conformity with the character of the defendant, in connection with the offense, if any, alleged against him in the indictment, and for no other purpose.

[10]Roof complains that "the trial court never orally instructed the jury on those uses when those extraneous acts were admitted during trial (at a time when the jury would have afforded greater gravitas to those instructions)."  Roof did not request a contemporaneous limiting instruction when any of the extraneous-offense evidence was admitted, and he fails to support his claim that the jury "would have afforded greater gravitas" to a contemporaneous instruction.

16

assault allegations—especially those made decades after their occurrence, as in this case—as evidence that would naturally be understood by a jury without further expert insight." Roof does not cite any authority supporting this contention, and we decline to hold that a jury is not equipped to evaluate the probative force of delayed-outcry evidence of sexual assault absent expert witness testimony.

In arguing that this evidence had a strong tendency to confuse or distract the jury, Roof repeatedly characterizes his extraneous acts as "dissimilar" from the charged offenses. All of the extraneous acts at issue were sexual conduct by Roof targeted at younger, female relatives where he lived at the time, just like his offenses against Alice.[11] We therefore reject Roof's appellate contention that the extraneous acts were "dissimilar from the charged offenses." The third, fourth, and fifth *Gigliobianco* factors weigh in favor of the trial court's ruling.

---

[11]Roof attempts to further distinguish his extraneous acts from the charged offenses by characterizing his relationships with Theresa, Diane, Carol, and Annie as "familial" and his relationship with Alice as "non-familial." Alice's grandmother dated and lived with Roof. Alice called him "Pawpaw." Diane testified that she considered Alice a niece and that Missy was "like [a] niece" to her. We are unpersuaded by the distinction that Roof attempts to draw.

We are likewise unpersuaded by Roof's contention that "his 'peephole' extraneous act had nothing to do with physical acts of sex at all." In the context of the physically violent acts of sex, including rape, that Roof committed against his sisters, the trial court could have reasonably concluded that Roof's drilling of peepholes so that he could see his sisters in the bathroom was a sexual act like the other extraneous conduct.

Regarding the sixth and last *Gigliobianco* factor, Roof contends that "the extraneous acts caused undue delay in the trial by consuming an inordinate amount of time to develop" and that this factor therefore weighs against admission. We disagree. In *Perez*, we held that this factor weighed "slightly in favor of excluding the sisters' testimony," which comprised "91 pages of the 600 pages, roughly fifteen percent, of testimony presented to the jury by both sides in the guilt and innocence stage." 562 S.W.3d at 691. The State concedes that the extraneous evidence against Roof "had a similar, if slightly smaller ratio, to that in *Perez*." However, the State also points out that this factor considers whether the extraneous evidence repeats evidence that has already been admitted. *See Gigliobianco*, 210 S.W.3d at 642. Here, although a small portion of the extraneous-offense evidence—such as Diane's testimony about Roof's molestation of Carol, to which Carol had already testified—was repetitive, the overwhelming majority of it did not "merely repeat evidence already admitted." *Id.* Finally, because the State had proffered the extraneous evidence to the trial court outside the presence of the jury, the trial court could have reasonably determined that the presentation of the evidence about the extraneous bad acts would not consume an inordinate amount of time or merely repeat evidence already admitted. *See Newhouse v. State*, No. 02-23-00265-CR, 2024 WL 3819307, at *5 (Tex. App.—Fort Worth Aug. 15, 2024, pet. ref'd) (mem. op., not designated for publication); *Harris v. State*, 572 S.W.3d 325, 334–35 (Tex. App.—Austin 2019, no pet.). On balance, this factor weighs neutrally if not slightly in favor of admission.

18

Based on our foregoing analysis, we cannot conclude that the trial court abused its discretion in admitting any of the extraneous evidence Roof complains about on appeal. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). Roof had the burden to overcome this presumption by demonstrating that the probative value of the evidence was substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *See* Tex. R. Evid. 403, *see also Upchurch*, 656 S.W.3d at 178; *Wells v. State*, 558 S.W.3d 661, 669 (Tex. App.—Fort Worth 2017, pet. ref'd). Because he did not meet that burden, we hold that the trial court did not abuse its discretion in admitting the extraneous evidence of Roof's past sexual predation over his Rule 403 objection. Balancing all six of the *Gigliobianco* factors, the trial court's determination was within the zone of reasonable disagreement. We overrule Roof's first issue.

## B. No Abuse of Discretion in Admitting Pitman's Testimony

In Roof's second issue, he argues that the trial court erred by admitting Pitman's testimony "that he believed the child-victim's allegations were not coached (and, thus, truthful) where this [c]ourt has previously held that testimony from any witness vouching for another witness's credibility is irrelevant and inadmissible." He cites our opinion in *Elmawla v. State*, in which we said that "the vouching for another witness's credibility is irrelevant and inadmissible because it goes beyond assisting the

19

trier of fact in understanding the evidence or determining a fact in issue—it decides an issue for the jury." No. 02-19-00279-CR, 2021 WL 1421437, at *3 (Tex. App.—Fort Worth Apr. 15, 2021, pet. ref'd) (mem. op., not designated for publication). We thus held that a trial court had erred in overruling the defendant's "relevance" and "bolstering" objections to a police officer's testimony that he found the complainant in a terroristic threat case credible and that he believed what she told him. *Id.*

Pitman's testimony in this case is not like the officer's in *Elmawla*. Pitman did not vouch for Alice's credibility or testify that he believed her. He testified that he "didn't have concerns" that Missy had coached her about what to say and that he did not even believe that Missy had the capacity to coach a child in that way.

We recently declined to hold that a forensic interviewer's merely testifying that she did not have any concerns about a child complainant being dishonest with her constituted "a direct opinion on the truthfulness" of the child's allegations because the testimony "did not convey the interviewer's opinion as to whether the child was telling the truth." *Choice v. State*, No. 02-23-00038-CR, 2024 WL 273586, at *7 (Tex. App.—Fort Worth Jan. 25, 2024, no pet.) (mem. op., not designated for publication) (quoting *Cantu v. State*, 366 S.W.3d 771, 778 (Tex. App.—Amarillo 2012, no pet.)). And we have held that a trial court did not abuse its discretion by allowing a forensic interviewer to testify about her "lack of concern" during the forensic interview that a child complainant had been coached. *Hernandez v. State*, No. 02-16-00373-CR, 2018 WL 3764066, at *9 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op.,

20

not designated for publication). We similarly hold here that the trial court did not abuse its discretion when it overruled Roof's objections and allowed Pitman to testify that he did not have "concerns" that Missy had coached Alice about what to say. We overrule Roof's second issue.

## C. NO CUMULATIVE ERROR

In his third issue, Roof argues that "the cumulative effect of the trial court's errors synergistically created harm where admission of both categories of evidence centered directly on convincing the jury of [Alice]'s credibility and posed a danger of convincing the jury to convict Roof without regard to the actual evidence presented on his charged offenses." We have concluded that neither of his other issues demonstrate error in the trial court's judgment. Having overruled Roof's first two issues, we likewise overrule his third issue. *See Choice*, 2024 WL 273586, at *8 (collecting cases).

## III. CONCLUSION

Having overruled Roof's three issues, we affirm the trial court's judgments.

/s/ Brian Walker

Brian Walker
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 12, 2024

21