

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00161-CR

———————————————————

BRUCE ALLAN TUCKER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. CR14769

---

Before Sudderth, C.J.; Birdwell and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

A jury convicted Appellant Bruce Allan Tucker of continuous sexual assault of a young child stemming from his years-long abuse of his granddaughter, K.M. (Kim).[1] *See* Tex. Penal Code Ann. § 21.02. The jury assessed his punishment at life imprisonment, and the trial court sentenced him accordingly. In two issues on appeal, Tucker argues that (1) the trial court abused its discretion by allowing extraneous-offense testimony from two witnesses—C.S. (Carla) and L.B. (Leslie)—over his Article 38.37[2] objection and (2) the trial court erred by not including an instruction in the jury charge that the evidence admitted under Article 38.37 could only be considered if the jury found the offenses to have actually been committed beyond a reasonable doubt. We will assume, without deciding, that the trial court erred by admitting Carla's and Leslie's testimonies and by failing to include the jury instruction. However, because Tucker was not harmed by the admission of Carla's and Leslie's testimonies or egregiously harmed by the jury charge, we will affirm.

---

[1]To protect the complainant's anonymity, we use an alias to refer to her, to some of her family members, and to other alleged victims of Tucker's abuse. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[2]*See* Tex. Code Crim. Proc. Ann. art. 38.37.

## II. BACKGROUND

### A. Kim's Familial Relationship with Tucker

Kim is Tucker's biological granddaughter. Kim's mother (Mother) is Tucker's daughter. While growing up, Mother had a close relationship with Tucker and maintained that relationship into adulthood. Kim was born in January 2008.[3] Mother and Kim lived with Tucker when Kim was "an infant up until toddler age." Kim and Mother moved out of Tucker's home after Mother met and married Stepfather, who was in the Navy and stationed in the State of Washington. The family lived on a naval base there, and it grew with the birth of Kim's two brothers.

Kim and her family spent summers and holidays visiting Texas, and they often stayed with Tucker at his home in Cresson, Texas. Stepfather was often deployed during the summer, but he would try to visit the family during the summer when he could.[4] Kim and her brothers had a close relationship with Tucker and called him "Papa." At Tucker's house, Mother had her own room, and Kim shared a room and a three-tiered bunk bed with her two brothers.

---

[3]Kim was born premature and had to spend the first five months of her life in a neonatal intensive care unit. Kim had developmental issues as a result of being born premature, including issues walking—which necessitated surgery to correct—and had to be on oxygen for around two-and-a-half years after she was born.

[4]Kim testified that Stepfather was on deployment most of the time during the summers and would visit the family in Texas for "[m]aybe like a week or so."

## B. Tucker's Abuse of Kim

At Tucker's trial, Kim testified that Tucker began sexually abusing her when she was around five or six years old. According to Kim, the first time it happened, she and Tucker were alone in Mother's room at Tucker's house. Kim testified that she was on the bed watching television when Tucker laid on the bed and started rubbing her vagina with his fingers both over and under her clothes. Kim stated that Tucker then told her that she should not tell anybody that it had happened.

Kim testified about another incident of abuse that occurred during a game of "cops and robbers" with Tucker in her room when she was around five or six years old. She recounted that while they were playing, she ran and hid behind the door in Mother's room, and Tucker found her and handcuffed her with a set of fake handcuffs. She stated that Tucker then carried her to her youngest brother's bed where she fell asleep.[5] According to Kim, when she awoke, she saw that Tucker had pulled down her pants and underwear and that he was on his knees next to her with his pants and underwear down. She then got up and went to the bathroom. She recounted that in the bathroom, she discovered that her vagina was filled with a sticky substance that appeared to be semen.[6]

---

[5]When asked why she had fallen asleep during the game, Kim stated she had "no clue."

[6]Kim was sixteen years old when she testified at trial.

In another incident described by Kim at trial, she asked Tucker if she could play a game on his phone. She noticed that he was watching pornography on the phone and asked him what it was. At first, he told her that she was too young for it, but when she asked him again, he showed her multiple pornographic videos depicting adults having sex. Kim testified that after Tucker showed her the pornographic videos, he touched her vagina with his fingers.[7]

Kim stated that on another occasion, she was lying on her bunk bed when Tucker came in to talk to her. Tucker told her that he would rub her feet because she was having problems resulting from a surgery to correct her issues walking. According to Kim, Tucker only rubbed her feet "for a little bit"; he then started touching and rubbing her vagina under her clothes. Kim testified that after that occurrence, Tucker frequently told Kim's family that he was going to rub her feet, but he would then rub and touch her vagina instead. She stated that he only actually rubbed her feet if Mother walked in the room. Kim told the jury that Tucker rubbed and touched her vagina "[a]lmost every day" during the summers that she and her family stayed with him, but she said that Tucker did not abuse her on the days that Stepfather was with the family in Texas.

Kim testified about another occasion that occurred when she was "older than five or six." She stated that on that occasion, Mother and her brothers were away

_____

[7]During her testimony at trial, Kim could not recall whether that contact had occurred over or under her clothing.

from the home, and she was left alone with Tucker. She said that she was asleep and woke up to Tucker taking off her pants and underwear and touching her vagina with his penis. She stated that she was too afraid to look, but she heard Tucker say, "I told you I could make you fall asleep."

Kim recounted that on another occasion, she was on her bunk bed and Tucker got on the bunk with her. Kim stated that Tucker then took out his penis, forced it into her mouth, and made her suck it. According to Kim, Tucker then took her pants and underwear off, put his mouth on her vagina, and licked it. Kim stated that semen came out of Tucker's penis while he was doing this. She said that the incident lasted around an hour and that it only stopped when her brothers started running around near the bedroom door. She stated that she was "[o]ver five or six" when this incident occurred.

Kim told the jury about another occasion when she and Tucker were watching a movie on Tucker's bed. According to Kim, during that occasion, Tucker grabbed her hand and put it on his penis. Kim stated that Tucker then asked her if she wanted to play dress-up, and he brought a bra and some tank tops out of his closet. Kim said that she refused to put on the bra, but she did try on two of the tank tops. Kim stated that Tucker told her that she could change in his closet so he would not see her, but she believed that he watched her change.

Kim testified about other occasions when Tucker made her look at his penis. She recounted that she once walked into Tucker's bedroom to ask him for something

6

and saw him putting lotion on his penis with his hands and using a towel on it. She stated that she tried to quickly walk out of the room, but Tucker told her to stay and watch, so she did. She told the jury about another occasion when Tucker called her into the bathroom while he was taking a shower. Kim stated that she had believed that Tucker just wanted to talk with her through the closed shower curtain as he had done on other occasions. She said that on this occasion, however, when she went in the bathroom, Tucker got out of the shower and told her to look at his penis.

Kim also testified that when she was "[a]round six or seven," Tucker touched her anus with his penis and put his hand in her underwear and squeezed her "butt."

According to Kim, Tucker told her that he would get in trouble if she told anyone about the abuse and that they would not be able to see each other anymore. She stated that he also told her that she would get in trouble and go to jail if she said anything about the abuse, and she believed him. She said that Tucker also repeatedly told her that no one in her family would believe her because she used to lie when she was younger. Kim later told Mother that Tucker had said that he would kill Mother, Kim's brothers, and another family member if Kim told anybody about the abuse. Kim also told Mother that Tucker said that what he did to her was just something that grandfathers do to their granddaughters.

**C. The Report of Tucker's Abuse to Family Members and Law Enforcement, and the Forensic Interview in Washington**

Tucker's abuse came to light in August 2019 when Kim was eleven years old. As explained by Kim, her cousin was visiting the family at Tucker's house, and the girls were swimming in Tucker's backyard swimming pool. After they were done swimming, Mother took Kim's cousin to take a shower and left Kim sitting on a couch in the living room with Tucker. Kim was wearing a one-piece bathing suit and a cover-up. Mother told the jury that she came out of the bathroom and saw that Kim's cover-up was pulled down and that Kim was "sitting with her legs open with her crotch exposed to [Tucker], who was sitting on the other couch." Mother stated that she asked Kim several times to fix her cover-up and "sit like a lady," but each time Mother came into the living room, Kim's cover-up was pulled down and her legs were spread open.

When it was Kim's turn for a shower, Mother brought her into the bathroom and started asking her why she was sitting and acting inappropriately around Tucker. Initially, Kim denied that anything inappropriate had occurred with Tucker. However, after approximately an hour of Mother questioning her, Kim told Mother that Tucker had been abusing her. Mother stated that when she opened the bathroom door after Kim told her about the abuse, she saw Tucker standing outside the door. Mother indicated that Tucker immediately questioned her about what was

wrong with Kim. Mother said that she told Tucker that Kim just had "some things going on at school" and that Mother did not want to talk about it.

Mother and the children left Tucker's house the next morning. They dropped Kim's cousin off at her house and went to Kim's grandmother's house. On the way to the house, Kim told Mother about Tucker's abuse. They stayed at Kim's grandmother's house until it was time for them to go back to Washington. While there, Kim told Mother, her grandmother, and her godmother about Tucker's abuse.

When the family arrived back in Washington, Mother went to the Naval Criminal Investigation Service (the NCIS) office on base and reported Tucker's abuse. The NCIS referred Kim to the Kitsap County[8] Children's Advocacy Center for a forensic interview. Mother took Kim to the center, where she was interviewed by Sasha Mangahas, a child forensic interviewer. During the recorded interview, Kim described Tucker's abuse to Mangahas.[9] Kim described Tucker touching her vagina with his hands and fingers, inserting his penis in her mouth, making her touch his penis with her hands, putting his mouth on her vagina, and placing his penis against her "butt." Kim also described how she had seen "slimy" stuff come out of Tucker's penis. Kim told Mangahas that Tucker had said not to tell anyone about the abuse because he would get in trouble. Kim also told Mangahas that some form of abuse

---

[8]Kitsap County is in Washington.

[9]Mangahas's interview of Kim was admitted into evidence at trial and published for the jury.

9

had happened "every time" she went to Tucker's house and that it had been occurring for years.

The NCIS later contacted the Hood County District Attorney's Office in Texas to report the alleged abuse. Investigator Birt Wilkerson of the Hood County District Attorney's Office began investigating the alleged abuse.

## D. Tucker's Arrest and Search of His House

Wilkerson later arrested Tucker and searched his home pursuant to a search warrant. Wilkerson testified that during the search of Tucker's home, officers found a trove of pornographic photos and materials, "little fancy dresses" for girls, and "panties and lingerie for little girls."[10] Officers also discovered play handcuffs in one of the bedrooms, a condom in the room that Kim shared with her younger brothers, a set of handcuff keys on Tucker's nightstand, chains and shackles in Tucker's bedroom, and a police badge inside one of the drawers of Tucker's nightstand. One of the pornographic magazines located in Tucker's home was called *Finally Legal.* Officers also found photographs of a scantily-clad teenage girl near the condom in the children's room.[11] In two of the photographs, the girl was wearing a bikini swimsuit;

---

[10]Many of the girls' clothing items and undergarments were found in Tucker's bedroom closet. As to those items, Wilkerson acknowledged that other children and women besides Kim and Mother had lived at Tucker's house and that he was not certain that some of the clothing and lingerie was for children rather than a smaller adult woman.

[11]Wilkerson estimated that the girl depicted in the photographs appeared to be fifteen or sixteen years old.

in one of the photographs, the girl was wearing black shorts and a white bra; in the last photograph, the girl was wearing pink shorts and a white bra. The photographs of the teenage girl appeared to Wilkerson to have been taken in Tucker's bedroom.

**E. The Pretrial Hearing**

As Tucker's case moved toward trial, the State gave notice that it was planning to introduce evidence of Tucker's prior bad acts, listing an incident involving Tucker and Carla in or around 2004 and an incident involving Tucker and Leslie in or around 2001. Tucker filed a motion for a hearing regarding those incidents under Article 38.37. *See* Tex. Code Crim. Proc. Ann. art. 38.37. The trial court later held a preliminary hearing to determine whether Carla's and Leslie's potential testimonies met the requirements of Article 38.37 and were therefore admissible during trial.

**1. Carla's Testimony at the Pretrial Hearing**

Carla was thirty-five years old at the pretrial hearing; she testified about an incident with Tucker that occurred when she was sixteen or seventeen years old. Carla stated that Tucker was the father of two of her friends, that she had been to his house "about a hundred times," and that he had provided her with alcohol on multiple occasions and had offered to provide her with cocaine. She testified that on the day of the incident, she had gone to Tucker's house to ask him for cocaine and was alone with him. She said that Tucker told her that he could not get her any cocaine but that he could get muscle relaxers. She stated that Tucker then gave her muscle relaxers, and she took them. After taking the pills, Carla left the house with

11

Tucker. While out, they went to a liquor store, where Tucker bought rum. Carla stated that she drank the bottle of rum, and Tucker took her back to his house.

According to Carla, once they arrived back at Tucker's house, Tucker's dog jumped on her and got her clothes muddy, so Tucker told her to take off her clothes and put them in the washing machine. Carla took off her pants, put them in the washing machine, and put on some boxer shorts. Then she sat on a couch next to Tucker. Carla testified that while on the couch, Tucker "put his hand between [her] thighs and he licked [her] neck." Carla stated that she then jumped up and ran out of the house. On cross-examination, Carla recalled that she had been seventeen years old when the incident had occurred and that Tucker's contact with her thighs was over her clothing.

### 2. Leslie's Testimony at the Pretrial Hearing

Leslie was thirty-six years old at the time of the pretrial hearing; she testified about an incident with Tucker that occurred when she was thirteen. Tucker was the father of Leslie's first boyfriend. She said that the incident had occurred after a fight with her father, when she had called her boyfriend to come pick her up because she was "running away." Since her boyfriend was not old enough to drive, Tucker drove him to Leslie's house, picked her up, and brought her to Tucker's house. Leslie stayed at Tucker's house for several days. According to Leslie, on her last day at Tucker's house, Tucker called her into his bedroom. Leslie stated that after he called her into the bedroom, Tucker grabbed both of her arms and kissed her on the lips.

Leslie said that she then left Tucker's bedroom. A few hours later, Leslie's father came to Tucker's house and took Leslie home.

### 3. The Trial Court's Ruling at the Pretrial Hearing

After Carla and Leslie testified, the State argued that their testimonies showed that Tucker had attempted to commit one of the enumerated acts under Article 38.37 and showed conduct that consisted of "more than mere preparation," so Carla and Leslie should be allowed to testify at the guilt–innocence phase of the trial.

The defense argued that although Tucker may have committed several criminal acts, he did not commit any of the enumerated acts under Article 38.37 against either woman, so Carla's and Leslie's testimonies were not sufficient to prove that Tucker had committed any of the enumerated offenses and were thus inadmissible during the guilt–innocence phase of Tucker's trial.

At the conclusion of the hearing, the trial court ruled that Carla and Leslie could both testify at trial regarding their respective incidents with Tucker. Specifically, the trial court stated,

> I'm going to make a finding that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the Defendant committed the separate attempted offenses, many of which are listed, beyond a reasonable doubt. These would be attempted offenses under Section 2, whether it be attempted indecency with a child, sexual assault of a child, sexual performance by a child. That one in particular would be for [Carla] who may have been 17 years of age. Okay. And we conducted a hearing for that purpose, and so I will allow that testimony.

13

**F. Tucker's Trial**

Tucker's trial was held over four days in April 2024. At the outset of trial, Tucker asked for and was granted a running objection to all testimony concerning the acts that Tucker had allegedly committed against Carla and Leslie.

The State presented testimony from Kim, Mother, an NCIS agent, Mangahas, Wilkerson, Carla, and Leslie.[12] The defense presented one witness.[13] At the close of evidence, a jury charge was prepared and submitted to the trial court. Neither side had any objections to the charge.

The jury ultimately found Tucker guilty of the offense of continuous sexual abuse of a young child and assessed his punishment at life imprisonment. The trial court sentenced him accordingly. Tucker later filed a motion for a new trial, which the trial court denied after an evidentiary hearing. This appeal followed.

---

[12]The pertinent evidence from these witnesses has been set out in our earlier discussion of the facts. Carla's and Leslie's testimonies largely mirrored their testimonies from the pretrial hearing.

[13]The defense witness was H.K. (Helen), Tucker's former daughter-in-law. Helen testified that Tucker was the father of her deceased husband and the grandfather of her two children. Helen said that she frequently visited Tucker at his house and even lived with him while she was pregnant with her oldest child. She stated that in August 2019, Mother and Kim's grandmother informed her that Tucker had been abusing Kim. Helen said that Mother had told her that she was "going to get Tucker" and "take him for everything he had." Helen also testified that a very petite woman with small breasts had lived with Tucker and could have fit into smaller-sized bras.

14

## III. DISCUSSION

### A. The Admission of Carla's and Leslie's Testimonies

In his first issue, Tucker argues that the trial court abused its discretion by allowing Carla's and Leslie's testimonies over his Article 38.37 objection. Specifically, he argues that "[t]here was insufficient evidence for the trial court to conclude that a reasonable jury could find beyond a reasonable doubt that [he] committed the separate offenses alleged by the prosecution" and that he suffered harm as a result of the trial court's admission of Carla's and Leslie's testimonies.

#### 1. Standard of Review

We review the trial court's decision to admit evidence for an abuse discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). Because the trial court "has the best view of the evidence," an appellate court will not find error in a trial court's ruling if it falls within the zone in which reasonable minds may differ. *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021); *Jumper v. State*, No. 02-22-00286-CR, 2024 WL 3059060, at *2 (Tex. App.—Fort Worth June 20, 2024, pet. ref'd) (mem. op., not designated for publication). However, if the trial court's decision falls outside the "zone of reasonable disagreement," it has abused its discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

### 2. Applicable Law

Generally, an accused may be tried only for the offense for which he is charged and may not be tried for an uncharged crime or for being a criminal generally. *Gusman v. State*, No. 02-18-00157-CR, 2018 WL 3060213, at \*2 (Tex. App.—Fort Worth June 21, 2018, pet. ref'd) (mem. op., not designated for publication) (citing *Stafford v. State*, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991)). "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). However, Article 38.37 provides an exception to this general rule in cases in which the defendant is on trial for certain sexual offenses involving a child, including the offense of continuous sexual abuse of a young child. *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 2(a)(1)(B). "Notwithstanding Rules 404 and 405," evidence that a defendant has committed a separate offense described by Subsection (a)(1) or (2) "may be admitted in the trial of an alleged offense described by Subsection (a)(1) or (2) for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." *Id.* § 2(b).

Before a trial court admits such evidence, the court must "(1) determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt; and (2) conduct a hearing out of the presence of the jury for that purpose." *Id.* § 2-a;

16

*see Davis v. State*, No. 02-23-00119-CR, 2024 WL 976501, at *4 (Tex. App.—Fort Worth March 7, 2024, pet. ref'd) (mem. op., not designated for publication). The State, as the proponent of extraneous-offense evidence, bears the burden of showing the admissibility of the evidence under Article 38.37. *See Gamble v. State*, No. 2-07-174-CR, 2009 WL 806879, at *3 (Tex. App.—Fort Worth Mar. 27, 2009, pet. ref'd) (per curiam) (mem. op., not designated for publication) (citing *Rankin v. State*, 974 S.W.2d 707, 718 (Tex. Crim. App. 1998) (op. on reh'g)).

### 3. Tucker's Complaint

Tucker argues that the trial court erred by admitting Carla's and Leslie's testimonies because the evidence was insufficient to support the trial court's determination that a reasonable jury could find beyond a reasonable doubt that he committed the separate offenses the prosecution alleged and that the actions alleged by the prosecution cannot, as a matter of law, sustain a conviction for any of the offenses required by Article 38.37, Section 2.

Tucker contends that since there was no evidence he actually committed any of the enumerated crimes listed in Article 38.37, the State offered Carla's and Leslie's testimonies to prove he committed an attempted crime. Specifically, he argues that the trial court admitted Carla's testimony on the basis that it would be adequate to support a finding that Tucker had committed attempted sexual performance by a child and admitted Leslie's testimony on the basis that it would be adequate to support a finding that Tucker had committed attempted indecency with a child or

attempted sexual assault of a child. He contends that because an attempted crime requires specific intent, the State was required to prove that he had the specific intent to commit one of the offenses listed in Article 38.37. Tucker maintains that the State failed to show that he did any act that amounted to more than mere preparation and failed to show that he had the specific intent to have either sexual contact or sexual intercourse with Carla or Leslie. Tucker argues that because there was no evidence of his specific intent, the trial court abused its discretion by allowing the jury to hear Carla's and Leslie's testimonies.

### 4. Analysis

Assuming, without deciding, that the trial court erred by admitting Carla's and Leslie's testimonies, we find no harm that requires reversal. The erroneous admission of extraneous offenses generally does not constitute constitutional error. *Pyle v. State*, No. 02-24-00155-CR, 2025 WL 728111, at *7 (Tex. App.—Fort Worth Mar. 6, 2025, pet. ref'd) (mem. op., not designated for publication); *Perez v. State*, 562 S.W.3d 676, 691 (Tex. App.—Fort Worth 2018, pet. ref'd); *see also Patterson v. State*, No. 02-23-00012-CR, 2024 WL 1207306, at *12 (Tex. App.—Fort Worth Mar. 21, 2024, pet. ref'd) (mem. op., not designated for publication) (stating that error in the admission of evidence in violation of Rule 404 is generally not constitutional error).

Because the error is not constitutional, we apply Rule 44.2(b). Tex. R. App. P. 44.2(b). That rule requires us to disregard any nonconstitutional error that does not affect the appellant's substantial rights. *Id.* A substantial right is affected when

18

the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Here, the evidence of Tucker's guilt is overwhelming. Kim testified at length and provided the jury with a detailed account of Tucker's years of abuse and recounted many specific instances of abuse. Specifically, she stated that Tucker had touched her vagina with his hands, had put his mouth on her vagina and licked it, had touched her vagina with his penis, had forced his penis into her mouth and made her suck it, had grabbed her hand and put it on his penis, had touched her anus with his penis, and had squeezed her "butt." She said that these events had begun when she was five or six years old and that Tucker had rubbed and touched her vagina "[a]lmost

19

every day" during the summers that she and her family stayed with him until she reported the abuse in 2019.

Kim testified that Tucker had forced her to look at his penis, had shown her pornography, and had asked her to try on a bra and watched her change into tank tops. Kim also described seeing semen come out of Tucker's penis and finding a sticky substance that appeared to be semen in her vagina. Kim also explained that she had not told anyone about the abuse for years because Tucker had told her that they would both get into trouble if she talked about the abuse.

Kim also described Tucker's abuse in detail during the forensic interview with Mangahas. Kim told Mangahas about instances in which Tucker had touched her vagina with his hands and fingers, inserted his penis in her mouth, made her touch his penis with her hands, put his mouth on her vagina, and placed his penis against her "butt." Kim described seeing "slimy" stuff come out of Tucker's penis during at least one of these occurrences. Kim relayed to Mangahas that some form of abuse had happened "every time" she went to Tucker's house and that it had been occurring for years.

Kim's allegations against Tucker were also supported by the physical evidence and photos that were discovered by Wilkerson during the search of Tucker's house. Among other things, the jury saw photos of the clothes and lingerie for girls that Tucker kept in his closet, the handcuffs and shackles that Tucker kept in his bedroom,

20

Tucker's collection of pornographic materials, and Tucker's photographs of a scantily-clad teenage girl that appeared to have been made in Tucker's bedroom.

Compared to the rest of the witness' testimonies and the evidence, Carla's and Leslie's testimonies were only a minor part of the State's case against Tucker. Carla's and Leslie's combined testimonies constituted approximately nineteen pages of testimony in the three volumes of the reporter's record containing the guilt–innocence phase of Tucker's trial. Moreover, while the State briefly mentioned Carla's and Leslie's testimonies in its opening statement, it did not overly emphasize them. The State's opening statement took up approximately 138 lines of the reporter's record, but the State's reference to the expected testimony from Carla and Leslie took up approximately four lines of the reporter's record.[14] The State did not mention Carla's and Leslie's testimonies in its closing argument.

Based on our review of the record, assuming that the trial court abused its discretion by admitting Carla's and Leslie's testimonies, we conclude that, in the context of the entire case against Tucker, any error in admitting their testimonies did not have a substantial or injurious effect on the jury's verdict and did not affect Tucker's substantial rights. *See Macedo*, 629 S.W.3d at 240; *Haley*, 173 S.W.3d at 518; *Carrillo v. State*, No. 08-14-00174-CR, 2016 WL 4447611, at *7 (Tex. App.—El Paso

---

[14]The State told the jury, "But you're also going to hear from two other young ladies: [Carla and Leslie]. And they're going to tell you about the things that [Tucker] did to them when they were young girls, when they were teenagers."

21

Aug. 24, 2016, no pet.) (not designated for publication) (holding that any error in the admission of extraneous-offense evidence was harmless given the overwhelming evidence of the appellant's guilt). We overrule Tucker's first issue.

## B. Jury Instructions

In his second issue, Tucker argues that the trial court erred by not including an instruction in the jury charge that the evidence admitted under Article 38.37 could only be considered if the jury found the offenses to have actually been committed beyond a reasonable doubt. He further argues that as a result, he suffered egregious harm that warrants reversal.

### 1. Standard of Review

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Peralez v. State*, No. 02-23-00218-CR, 2024 WL 1792403, at *5 (Tex. App.—Fort Worth Apr. 25, 2024, pet. ref'd) (mem. op., not designated for publication). When reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Kirsch*, 357 S.W.3d at 649; *Peralez*, 2024 WL 1792403, at *5. If error occurred, whether it was preserved determines the degree of harm required for reversal. *Kirsch*, 357 S.W.3d at 649; *Peralez*, 2024 WL 1792403, at *5.

Because Tucker failed to object to the jury charge during trial, we can only overturn the conviction if the error "was so egregious and created such harm that appellant did not receive a fair and impartial trial[—]in short, that 'egregious harm' has

22

occurred." *Burnett v. State*, No. 2-00-171-CR, 2003 WL 1948696, at *4 (Tex. App.—Fort Worth Apr. 24, 2003, no pet.) (not designated for publication) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). To make such a determination, we consider the actual degree of harm in light of (1) the entirety of the jury charge; (2) the nature of the evidence, including the contested issues and weight of probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Almanza*, 686 S.W.2d at 171; *Burnett*, 2003 WL 1948696, at *4.

The purpose of this review is to determine the actual, not just theoretical, harm that the error caused to the defendant. *Almanza*, 686 S.W.2d at 174; *Chiodo v. State*, No. 2-06-096-CR, 2007 WL 1952375, at *1 (Tex. App.—Fort Worth July 5, 2007, pet. ref'd) (mem. op., not designated for publication). "Egregious" harm is present when the error made the case for conviction clearly and significantly more persuasive. *Chiodo*, 2007 WL 1952375, at *5; *see Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991). Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996); *Chiodo*, 2007 WL 1952375, at *1.

### 2. Analysis

Assuming, without deciding, that the trial court erred by not including an instruction in the jury charge that the evidence admitted under Article 38.37 could

23

only be considered if the jury found the offenses to have actually been committed beyond a reasonable doubt, we find no egregious harm.

As to the entirety of the charge, with the exception of the missing instruction regarding extraneous offenses, the jury charge was substantially correct, and Tucker makes no argument to the contrary. The jury charge correctly instructed the jury on the standard of proof for Tucker's alleged continuous sexual abuse of Kim and instructed the jury on the law concerning continuous sexual abuse of a child along with the underlying offenses that constitute continuous sexual abuse of a child.

Turning to the state of the evidence, as detailed above, the evidence against Tucker is strong and compelling. As noted above, Kim gave lengthy and detailed testimony describing Tucker's continuous sexual abuse, and that testimony is supported by the statements she made during the forensic interview and by the photographs and items seized from Tucker's home.

With regard to the arguments of counsel, as detailed above, the State did not emphasize Carla's and Leslie's testimonies at trial and did not mention them during closing arguments. Instead, the State used its closing argument to discuss the jury charge and Tucker's abuse of Kim. And neither party argued nor suggested an improper burden of proof for the extraneous offense.

Thus, based on the appropriate harm standard and taking all of the above-mentioned factors into account, we hold that that any omission of the instruction did not affect the very basis of the case, deprive Tucker of a valuable right, unduly affect a

24

defensive theory, or make a case for his conviction clearly and significantly more persuasive. *See Garcia v. State*, 710 S.W.3d 361, 365–66 (Tex. App.—Fort Worth 2025, pet. ref'd) (stating that errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect a defensive theory, or make a case for conviction clearly and significantly more persuasive). Thus, even if we assume error, Tucker has not been egregiously harmed. *See Almanza*, 686 S.W.2d at 171; *Chiodo*, 2007 WL 1952375, at *5; *Burnett*, 2003 WL 1948696, at *4. We overrule Tucker's second issue.

## IV. CONCLUSION

Having overruled both of Tucker's issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 24, 2025

25